# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| IN RE:<br><br>THOMPSON PUBLISHING HOLDING CO., INC., *et al.*,[1]<br><br>                      Debtors. | Chapter 11<br><br>Case No. 10-13070 (  )<br><br>**Joint Administration Requested** |

## MOTION OF DEBTORS FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS (A) TO OBTAIN POSTPETITION FINANCING AND (B) UTILIZE CASH COLLATERAL OF PRE-PETITION SECURED PARTIES (II) GRANTING ADEQUATE PROTECTION; (III) MODIFYING THE AUTOMATIC STAY, (IV) GRANTING RELATED RELIEF AND (V) SCHEDULING A FINAL HEARING AND ESTABLISHING RELATED NOTICE REQUIREMENTS

TPG AES Holding Co, Inc. ("TPG" or the "Borrower") and Thompson Publishing Holding Co., Inc. (the "Parent"), Thompson Publishing Group, Inc. ("Thompson"), AHC Media LLC ("AHC"), Alex eSolutions, Inc. ("SIS"), The Performance Institute, Inc. ("PI") and Thompson Publishing Development, LLC ("Development," and collectively with the Parent, Thompson, AHC, SIS and PI, the "Guarantors"), each as a debtor and debtor-in-possession (collectively, the "Debtors") in the above-captioned cases (collectively with any successor cases, the "Bankruptcy Cases") hereby move (the "DIP Motion"), pursuant to sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d), and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-2 of the Local Rules of

---

[1] The Debtors are the following entities (followed by the last four digits of their tax identification numbers): Thompson Publishing Holding Co. Inc. (5470), AHC Media LLC (2136), Alex eSolutions, Inc. (5725), Thompson Publishing Group, Inc. (2093), The Performance Institute, Inc. (8059), TPG AES Holding Co., Inc. (1658) and Thompson Publishing Development, LLC (2093) c/o P.O. Box 26185, Tampa, FL 33623-6185.

Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), for entry of an interim order (the "Interim Financing Order") substantially in the form of **Exhibit A** annexed hereto, inter alia,

(i) authorizing the Debtors to obtain secured postpetition financing on a superpriority basis (the "DIP Facility") pursuant to the terms and conditions of that certain Debtor in Possession Revolving Credit Agreement (as amended, supplemented, restated, or otherwise modified from time to time, the "DIP Credit Agreement") by and among the Borrower, the Guarantors, PNC Bank ("PNC") and the other lenders from time to time party thereto (the "DIP Lenders"), and PNC, as administrative and collateral agent (in such capacity, the "DIP Agent");

(ii) authorizing the Debtors to execute and deliver the DIP Credit Agreement and the other related credit documents (the "DIP Loan Documents") by and among the Borrower, the Guarantors, and the DIP Agent, and to perform such other acts as may be necessary or desirable in connection with the DIP Loan Documents;

(iii) granting the DIP Facility and all obligations owing thereunder and under the DIP Loan Documents to the DIP Agent and the DIP Lenders (collectively, and including all "Obligations" as described in the DIP Credit Agreement, the "DIP Obligations") allowed superpriority administrative expense claim status in each of the Bankruptcy Cases and any Successor Cases (as defined in the Interim Financing Order);

(iv) granting to the DIP Agent, for the benefit of itself and the DIP Lenders, automatically perfected security interests in and liens upon all of the DIP Collateral, including, without limitation, all property constituting Cash Collateral, as defined in section 363(a) of the Bankruptcy Code, which liens shall be subject to the priorities set forth herein;

(v) authorizing and directing the Debtors to pay the principal, interest, fees, expenses, and other amounts payable under the DIP Loan Documents as such become due, including, without limitation, closing fees and the reasonable fees and disbursements of the attorneys, advisers, accountants, and other consultants of the DIP Agent, all to the extent provided in and in accordance with the terms of the DIP Loan Documents;

(vi) authorizing the use of Cash Collateral of the Pre-Petition Agents and the Pre-Petition Lenders under the Pre-Petition Credit

Documents (each as defined herein), and providing adequate protection to the Pre-Petition Agents and Pre-Petition Lenders for any Adequate Protection Obligations (as defined herein);

(vii) modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and the Interim Financing Order, as limited pursuant thereto; and

(viii) scheduling a final hearing (the "Final Financing Hearing") to consider the relief requested in the DIP Motion and approving the form of notice with respect to the Final Financing Hearing.

In support of this Motion, the Debtors rely on the *Declaration of James J. Loughlin, Jr. in Support of Chapter 11 Petitions and First Day Motions and Applications* (the "First Day Declaration"), filed contemporaneously herewith and incorporated herein by reference, and further respectfully state as follows:

## *PRELIMINARY STATEMENT*

1.      The Debtors hereby seek, through approval of the Interim Financing Order, authorization to obtain the consensual use of the Cash Collateral and the post-petition financing provided by the DIP Facility to provide the Debtors with the liquidity necessary to operate during these Chapter 11 cases. If such relief is granted, the Debtors will have the ability to maintain their business as a going concern, retain the ability to operate, maintain business relationships with their vendors, authors, and subscribers, pay their employees, and maximize the value of the Debtors' estates through a sale, subject to this Court's approval, of substantially all their assets (the "Proposed Sale") at an auction (the "Auction"). The terms of the Proposed Sale are described in detail in the Sale Motion referenced in the First Day Declaration. Accordingly, the Debtors respectfully submit that the relief requested is decidedly in the best interests of the Debtors' estates and creditors and should be granted.

## JURISDICTION

2.     The Court has jurisdiction over the DIP Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of these proceedings and the DIP Motion in this Court is proper under 28 U.S.C. §§ 1408 and 1409.

3.     The statutory bases for the relief sought herein are sections 105, 361, 362, 363, and 364 of the Bankruptcy Code.

## BACKGROUND

4.     On September 21, 2010 (the "Petition Date"), the Debtors commenced their respective bankruptcy cases by filing voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. No trustee, examiner or creditors' committee has been appointed in these cases. The Debtors are operating their respective businesses as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

5.     The events leading up to the Petition Date and the facts and circumstances supporting the relief requested herein are set forth in the First Day Declaration.[2]

## SUMMARY OF THE DEBTORS' PRE-PETITION SECURED INDEBTEDNESS

6.     On or about July 6, 2007, the Borrower entered into the Amended and Restated Credit Agreement (the "Pre-Petition First Lien Credit Agreement") with PNC Bank, N.A., as successor to National City Bank, as Administrative Agent (in such respective capacity, the "Pre-Petition First Lien Agent") and the other lenders party thereto (collectively, with the Pre-Petition First Lien Agent, the "Pre-Petition First Lien Lenders"). Pursuant to the Pre-Petition First Lien Credit Agreement, and subject to the terms and conditions set forth therein,

---

[2]     Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Interim Financing Order or DIP Credit Agreement. To the extent that there is any conflict between the definitions contained in either the Interim Financing Order or the DIP Credit Agreement, the definitions in the Interim Financing Order shall control.

the Pre-Petition First Lien Lenders agreed to make certain loans to the Borrower, including (a) a $15,000,000 revolving credit facility, and (b) a $100,000,000 term loan. Also on July 6, 2007, the Borrower and the Pre-Petition First Lien Agent entered into the Second Amended and Restated Security Agreement, pursuant to which the Borrower granted to the Pre-Petition First Lien Agent, for the benefit of the Pre-Petition First Lien Lenders and as security for the Borrower's obligations to the Pre-Petition First Lien Lenders (the "Pre-Petition First Lien Obligations"), a first-priority security interest in all of the Borrower's assets. As of the Petition Date, the Debtors believe that the aggregate outstanding amount of the Pre-Petition First Lien Obligations is approximately $122,618,531.00.

7.       The Pre-Petition First Lien Obligations were guaranteed by each of the Guarantors (other than Development) and are secured by a first-priority lien on all of the assets of TPG, Thompson, SIS, AHC and PI. In addition, the stock or equity interests in each of TPG, AHC, Thompson, SIS and PI have been pledged to the Pre-Petition First Lien Agent as security for the Pre-Petition First Lien Obligations.

8.       The Borrower and PNC Bank, N.A., as successor to National City Bank, in its capacity as the "swap provider" (the "Swap Party") were party to that certain ISDA Master Agreement, dated as of September 12, 2007 (the "ISDA Agreement"). Pursuant to the ISDA Agreement, the Borrower is indebted to the Swap Party on account of certain contingent interest rate hedging agreements. The Borrower's obligations under the ISDA Agreement are secured by the liens and security interests granted to the Pre-Petition First Lien Agent. On June 15, 2010, the Pre-Petition First Lien Agent terminated the ISDA Agreement.

9.       On or about July 17, 2007, the Borrower entered into the Amended Second Lien Credit Agreement (the "Pre-Petition Second Lien Credit Agreement") with Ableco

Finance LLC (as successor to National City Bank), as Administrative Agent (in such respective capacity, the "Pre-Petition Second Lien Agent", and together with the Pre-Petition First Lien Agent, the "Pre-Petition Agents") and the other lenders party thereto (collectively, with the Pre-Petition Second Lien Agent, the "Pre-Petition Second Lien Lenders" and together with the Pre-Petition First Lien Agent, the "Pre-Petition Lenders"). Pursuant to the Pre-Petition Second Lien Credit Agreement, and subject to the terms and conditions set forth therein, the Pre-Petition Second Lien Lenders agreed to make a $40,000,000 term loan to the Borrower. The Borrower and the Pre-Petition Second Lien Agent entered into the Second Lien Security Agreement, dated as of July 6, 2007, pursuant to which the Borrower granted to the Pre-Petition Second Lien Agent, as security for the Borrower's obligations to the Pre-Petition Second Lien Lenders (the "Pre-Petition Second Lien Obligations"), a second-priority security interest in all of the Borrower's assets. As of the Petition Date, the Debtors believe that the aggregate amount of the Pre-Petition Second Lien Obligations is approximately $43,500,000.

10.    The Pre-Petition Second Lien Obligations were guaranteed by each of the Guarantors (other than Development) and are secured by a second-priority lien on all of the assets of TPG, Thompson, SIS, AHC and PI. In addition, the stock or equity interests in each of TPG, AHC, Thompson, SIS and PI have been pledged to the Pre-Petition Second Lien Agent as security for the Pre-Petition Second Lien Obligations (subject to the pledge of such shares to the Pre-Petition First Lien Agent).

11.    As a result of economic conditions and the challenges faced by the Debtors, they defaulted on their obligations under the Pre-Petition First Lien Credit Agreement due to (a) their failure to comply with certain financial covenants set forth therein for the fiscal quarters ending on and after October 31, 2009 and (b) their failure to make certain payments due

thereunder and under the ISDA Agreement. In addition, the Debtors defaulted on their obligations under the Pre-Petition Second Lien Credit Agreement due to (a) their failure to comply with certain financial covenants set forth therein for the fiscal quarters ending on and after October 31, 2009 and (b) their failure to make certain interest payments due thereunder. Due the events of default under the Pre-Petition First Lien Credit Agreement, the Debtors had no access to their revolving credit facility with the Pre-Petition First Lien Lenders.

12.    On February 9, 2010, pursuant to a written notice (the "Acceleration Notice"), the Pre-Petition Second Lien Agent accelerated the Pre-Petition Second Lien Obligations. Pursuant to the terms of the Intercreditor Agreement (as defined below), the Pre-Petition Second Lien Lenders were prohibited from taking any further action to enforce their rights and remedies until the passage of a standstill period of at least 120 days, provided that such standstill period lasts indefinitely so long as the Pre-Petition First Lien Lenders have commenced and are diligently pursuing the exercise of their rights and remedies with respect to the Debtors' assets.

13.    The Debtors, the Pre-Petition First Lien Agent and the Pre-Petition Second Lien Agent are parties to that certain Amended and Restated Intercreditor Agreement, dated as of July 17, 2007 (as has been amended, restated, supplemented or otherwise modified from time to time, the "Intercreditor Agreement"), which governs the respective rights, obligations and priorities of the Pre-Petition First Lien Lenders and the Pre-Petition Second Lien Lenders with respect to the matters referred to therein, including, without limitation, the use of Cash Collateral and the DIP Facility. A copy of the Intercreditor Agreement is attached hereto as **Exhibit B**. The security interests that secured the Pre-Petition Second Lien Obligations are subject to the

Intercreditor Agreement and are junior in all respects to the security interests that secure the Pre-Petition First Lien Obligations.

### *THE DEBTORS' NEED FOR POST-PETITION FINANCING*

14.     As a consequence of the factors described in the First-Day Declaration, the Debtors have insufficient cash to maintain business relationships with their vendors, authors, suppliers, employees and subscribers. In the event that any or all of those relationships are adversely affected by the commencement of these Bankruptcy Cases, the Debtors could face the prospect of having insufficient cash to finance their operations and to pay their employees and authors.

15.     Given the encumbrances upon substantially all of the Debtors' assets, including the Cash Collateral, the Debtors urgently need credit and additional capital to mitigate any negative effect of these Bankruptcy Cases and to continue their businesses and operations. Absent availability of new credit, there will be severely negative impact on the going-concern value of the Debtors' business.

16.     Accordingly, the Debtors require the availability of working capital from the use of Cash Collateral and the DIP Facility. The DIP Facility will instill a sense of confidence in the Debtors' employees, subscribers, authors, vendors, and other important stakeholders. The Debtors critically need the support of these stakeholders at this time, as the loss of their support could severely impair the Debtors' ability to maximize the value of their estates and, subject to this Court's approval, complete the Proposed Sale. The Debtors' ability to preserve the value of their estates for the benefit of their creditors depends upon the interim and final relief requested herein.

## SUMMARY OF THE DEBTORS' PROPOSED DIP FINANCING[3]

17.     The Debtors have determined, in the exercise of their sound business judgment, that to meet their working capital needs they require the use of the Cash Collateral and a post-petition credit facility in substantially the form described herein. Accordingly, subject to the Court's approval, the Debtors have determined to enter into the DIP Credit Agreement with the DIP Agent and DIP Lenders.

18.     The terms of the DIP Facility are more specifically set forth in the DIP Credit Agreement attached hereto as **Exhibit C**. Consistent with Bankruptcy Rule 4001(c) and this Court's requirements under Local Rule 4001-2(a)(i), the key provisions of the DIP Credit Agreement (and certain provisions related to the Debtors' use of Cash Collateral) are as follows:

| | |
|---|---|
| **Borrower:** | TPG AES Holding Co., Inc. |
| **Guarantors:** | Thompson Publishing Holding Co., Inc., Thompson Publishing Group, Inc., AHC Media LLC, Alex eSolutions, Inc., The Performance Institute, Inc. and Thompson Publishing Development, LLC |
| **Lenders:** | PNC Bank, National Association ("PNC"), and each of the other lenders from time to time party to the DIP Credit Agreement (together with PNC, the "DIP Lenders"). |
| **Administrative Agent:** | PNC, as administrative agent and collateral agent for the DIP Lenders under the DIP Credit Agreement (in such capacity, the "DIP Agent"). |
| **DIP Loan Facility:** | The DIP Facility will consist of a priming, senior secured, superpriority revolving credit facility in a committed amount of $3,000,000, of which $150,000 shall be reserved for letters of credit and $750,000 shall be available upon entry of the Interim Financing Order. |
| **Required Payments:** | In the event that the book balance of the Debtors' cash on hand exceeds $2,500,000 at any time there are outstanding loans under the DIP Facility, the Debtor shall be required to apply any such excess cash to the outstanding loans under the DIP Facility. |

---

[3]     The summaries and descriptions of the terms and conditions of the DIP Credit Agreement and the proposed Interim Financing Order are intended solely for informational purposes to provide the Court and parties in interest with an overview of significant terms thereof and should only be relied upon as such. The summaries and descriptions are qualified in their entirety by the DIP Credit Agreement and the Interim Financing Order. In the event there is a conflict between the DIP Motion and the DIP Credit Agreement or the Interim Financing Order, the DIP Credit Agreement and/or the Interim Financing Order, as applicable, shall control in all respects.

| | |
|---|---|
| **Interest Rates:** | A per annum rate equal to the greater of (i) PNC's prime rate <u>plus</u> 5.75% and (ii) 9.00% |
| **Default Interest:** | Upon the occurrence of an Event of Default, the Loans outstanding under the DIP Facility shall, at the option of the DIP Agent, bear interest at the applicable per annum interest rate then in effect <u>plus</u> 2.0%. |
| **Termination Date:** | As set forth in Paragraph 5 of the Interim Financing Order, the DIP Facility and the Debtors' right to use Cash Collateral will mature and terminate, on the "Termination Date", which is defined as the earliest to occur of (i) November 19, 2010; (ii) the date of acceleration of any outstanding borrowings under the DIP Facility pursuant to an Event of Default; (iii) the first business day on which the Interim Financing Order expires by its terms or is terminated, unless the Final Financing Order has been entered and become effective prior thereto; (iv) conversion of any of the Bankruptcy Cases to a case under Chapter 7 of the Bankruptcy Code unless otherwise consented to in writing by the DIP Agent, the Pre-Petition First Lien Agent, the Majority DIP Lenders and the requisite Pre-Petition First Lien Lenders; (v) dismissal of any of the Bankruptcy Cases, unless consented to in writing by the DIP Agent and the Majority DIP Lenders; (vi) the date of consummation of the Proposed Sale; and (vii) the effective date of any Debtors' plan of reorganization confirmed in the Bankruptcy Cases unless extended, as to the DIP Facility, with the prior written consent of the DIP Agent and Majority DIP Lenders and, as to the use of Cash Collateral, the Pre-Petition First Lien Agent and requisite Pre-Petition First Lien Lenders. |
| **Fees:** | <u>Agent's Fee</u>. $6,000 per month payable to the DIP Agent.<br><br><u>Closing Fee</u>. The Borrower shall pay to the Agent (for the ratable benefit of the Lenders) a closing fee equal to $150,000 upon the entry of the Interim Financing Order. |
| **Expenses:** | The Debtors shall pay or reimburse the DIP Agent for any and all of its accrued and unpaid reasonable fees, costs, expenses and charges payable under the DIP Loan Documents, including, without limitation, the reasonable and documented fees and expenses of the DIP Agent as provided in Section 12.14.1 of DIP Credit Agreement, all without further notice, motion or application to, order of, or hearing before, this Court, provided that such payments shall be made not earlier than ten (10) days following receipt by the Debtors, the United States Trustee and, if appointed, the Committee or its counsel, of a written invoice (subject to all applicable privilege or work product doctrines). |
| **Collateral:** | As security for the DIP Obligations, the DIP Agent, for the benefit of the DIP Lenders, shall be granted as of the Petition Date, priming, first priority and fully perfected security interests in and liens upon (such security interests and liens collectively, the "<u>DIP Liens</u>"), all present and after-acquired property of the Debtors of any nature whatsoever, including, without limitation, accounts receivable, inventory, general intangibles, chattel paper, real property, leaseholds, fixtures, machinery and equipment, deposit accounts, all cash and cash equivalents contained in any account maintained by any of the Debtors, investments, patents, trademarks, trade names, copyrights, rights under license agreements and other intellectual property as well as a pledge of all equity interests in each Debtor (other than the Parent), all inter-company notes or inter-company receivables due to each Debtor and all causes of action whether pursuant to federal or state law, including all claims and causes of action under sections 502(d), 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code and any other avoidance actions under the Bankruptcy Code and the proceeds thereof and property received thereby whether by judgment, settlement, or |

|  |  |
|---|---|
|  | otherwise, whether pursuant to federal law or applicable state law (collectively, "Avoidance Actions") of the Debtors or their estates and any and all rents, issues, products, offspring, proceeds and profits generated by any of the foregoing (collectively, the "DIP Collateral"), subject and subordinate only to the Permitted Prior Liens (as defined in the Interim Financing Order); provided however, that the security interest and liens described above in the Avoidance Actions, and the proceeds thereof, shall not attach until entry of the Final Financing Order. |
| **Cash on Hand / Use of Proceeds:** | Loans under the DIP Facility will be made available only if (a) the book balance of the Debtors' cash on hand is less than $1,000,000 and (b) the Interim Financing Order or Final Order, as applicable, is in full force and effect. The proceeds of Loans made under the DIP Facility shall be used to fund the Debtors' working capital, capital expenditures and the costs and expenses of the Bankruptcy Cases and other uses provided for in the Approved Budget, in each case, in accordance with the Approved Budget. |

| | |
|---|---|
| **Loan Documentation:** | Definitive loan documentation set forth in the DIP Loan Documents including, without limitation, the DIP Credit Agreement. |
| **Conditions Precedent:** | The closing of the DIP Facility and the Debtors' right to use Cash Collateral are subject to the satisfaction of various conditions precedent, as more fully described in Paragraph 8 of the Interim Financing Order. Such conditions include, without limitation, the entry of the Interim Financing Order and the execution and delivery of the DIP Credit Agreement and the other DIP Loan Documents. |
| **Superpriority Claim:** | In accordance with Bankruptcy Code sections 364(c)(1) and 364(d), the DIP Obligations shall constitute superpriority administrative expense claims (the "DIP Superpriority Claim") against each of the Debtors with priority in payment over any and all administrative expense claims, adequate protection claims, diminution claims and all other claims against the Debtors or their estates, which are now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, (a) claims related to the Pre-Petition First Lien Indebtedness and any adequate protection claims asserted by the Pre-Petition First Lien Agent on behalf of the Pre-Petition First Lien Lenders (b) claims related to the Pre-Petition Second Lien Indebtedness and any adequate protection claims asserted by the Pre-Petition Second Lien Agent on behalf of the Pre-Petition Second Lien Lenders, and (c) all administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 364, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114 of the Bankruptcy Code or otherwise, including those resulting from the conversion of the any of the Bankruptcy Cases pursuant to section 1112 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment; provided, however, that the DIP Superpriority Claims shall be subject to the Carve Out (as defined below). |
| **506(c) Waiver:** | Paragraph 19 of the Interim DIP Order provides that, with the exception of the Carve Out, upon entry of the Final Financing Order, the Debtors and the Debtors' estates (for themselves and for any trustee or estate representative appointed in the Bankruptcy Cases or any Successor Case) irrevocably waive for the benefit and in favor of the Pre-Petition First Lien Secured Parties the right to surcharge the Pre-Petition First Lien Collateral, pursuant to section 506(c) of the Bankruptcy Code or otherwise, without the prior written consent of the Pre-Petition First Lien Agent and no such consent shall be implied from any other action, inaction, or acquiescence by the Pre-Petition First Lien Secured Parties in this proceeding. Upon entry of a Final Financing Order, the Pre-Petition First Lien Secured Parties shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and no expenses of administration of the Bankruptcy Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, may be charged against proceeds, product, offspring or profits from any of the Collateral or the Pre-Petition Collateral under section 552(b) of the Bankruptcy Code. |
| **Budget:** | Amounts available under the DIP Facility and the Debtors' use of Cash Collateral shall be in accordance with the Approved Budget attached to the Interim DIP Order, subject the Permitted Variance (as defined in Paragraph 12.k. of the Interim Financing Order). The Approved Budget sets forth in reasonable detail by line item all projected sales, cash receipts and disbursements. Section 5.1.1(b) of the DIP Credit Agreement sets forth a process for the Approved Budget to be updated, subject to the approval of the DIP Agent. |

| | |
|---|---|
| **Carve Out:** | (a) Paragraph 14 of the Interim Financing Order provides that subject to the terms and conditions contained in this paragraph, the Adequate Protection Liens and Adequate Protection Claims and the DIP Liens and DIP Superpriority Claims, which have the relative lien and payment priorities as set forth herein, shall, in any event, in all cases be subject and subordinate only to a Carve Out (the "Carve Out"), which shall be comprised of the following:<br><br>(i) statutory fees payable to the U.S. Trustee pursuant to 28 U.S.C. §§ 1930(a)(6) with respect to the Debtors; and<br><br>(ii) subject in all cases to the limitations set forth in Interim Financing Order and to Court approval, the sum of (A) and (B) (collectively, the "Priority Professional Expenses"), where (A) is the aggregate amount of the Debtors' professional fees and disbursements which have been incurred, accrued, or invoiced in accordance with the Approved Budget (but remain unpaid) prior to the earlier of (i) the date on which the Pre-Petition First Lien Agent and/or DIP Agent provides written notice to the Debtors that an Event of Default has occurred and that the post-default Carve Out has been triggered (whether or not preceded by the receipt of written notice from Debtors that such Event of Default has occurred), (ii) the date on which the Debtors provide written notice to the Pre-Petition First Lien Agent and DIP Agent that an Event of Default has occurred and (iii) the Termination Date (unless the Termination Date results from the consummation of the Approved Sale, in which event the Carve Out Trigger Date shall not occur) (such earlier date, the "Carve Out Trigger Date"), in either case, for any professional of the Debtors retained by an order of the Court under section 327 or 328 of the Bankruptcy Code, but only to the extent such fees and expenses are or become allowed under section 330 of the Bankruptcy Code, and (B) is the aggregate amount of fees and disbursements of the Debtors' Professionals accrued in accordance with the Approved Budget after the Carve Out Trigger Date up to $100,000; provided, however, that if at the time the Court has approved the allowance and payment of the Priority Professional Expenses, the Carve Out will not be available to the extent that the Debtors have other unencumbered or less than fully encumbered assets consisting of cash and cash equivalents out of which Priority Professional Expenses and Statutory Fees can be paid; and provided further, however, that if the Carve Out is used at any time as set forth herein and subsequently unencumbered assets of Debtors become available, the DIP Lenders and the Pre-Petition First Lien Secured Parties shall be immediately reimbursed from such unencumbered assets for the release of their DIP Collateral proceeds for the purpose of funding the Carve Out prior to the use of such funds. |
| **Stipulations and Release; Challenge Period:** | In the Interim Financing Order, the Debtors stipulate to, among other things, the extent, validity, perfection and priority of the Pre-Petition First Lien Indebtedness and the security therefor, and agreed to release the Pre-Petition First Lien Secured Parties from any claims arising out of the Pre-Petition First Lien Documents. Pursuant to Paragraph 15 of the Interim Financing Order, until the date which is forty-four (44) days after the Petition Date (such time period to be subject to approval at the Final Financing Order hearing, the extent, legality, validity, perfection, priority enforceability and other matters noted in this Interim Financing Order with respect to the Pre-Petition First Lien Loan Documents and the Pre-Petition First Lien Secured Parties' liens in the Pre-Petition Collateral as security for the Pre-Petition First Lien Indebtedness are for all purposes subject only to the rights of (i) the Committee, provided it has obtained the requisite standing, and (ii) any other creditor or non-debtor party-in-interest who obtains the requisite standing, to (a) challenge in any manner the Pre-Petition First Lien Indebtedness, and/or assert claims or causes of action of any nature in any way arising out of, relating to, or in connection with the Pre-Petition First Lien Indebtedness or the Pre-Petition First Lien Loan Documents, or (b) assert or |

allege any other matters in any way arising out of, or relating to, or in connection with the Pre-Petition First Lien Indebtedness or the Pre-Petition First Lien Loan Documents, or (c) challenge the extent, legality, validity, priority, perfection and/or enforceability of any of the Pre-Petition First Lien Secured Parties' liens upon and security interests in the Pre-Petition Collateral pursuant to the Bankruptcy Code (the actions described in clause (a), (b) and/or (c) above, collectively referred to herein as a "Challenge").

19.     In addition to the foregoing, Paragraph 12 of the Interim Financing Order sets forth various Events of Default. Many of such Events of Default are usual and customary for post-petition financing arrangements. Such paragraph further provides that the Debtors' failure to meet certain sale process covenants, as described in detail in clauses (n) – (r) of Paragraph 12 of the Interim Financing Order, shall constitute an Event of Default. Among other things, an Event of Default shall occur if an Auction with respect to the Proposed Sale does not occur with forty-five (45) days after the Petition Date, or if the Proposed Sale does not close on or before November 18, 2010 (i.e., one day prior to the maturity of the DIP Facility).

20.     Paragraph 13 of the Interim Financing Order provides that upon the occurrence and during the continuance of an Event of Default, and without the necessity of seeking relief from the automatic stay, (i) the DIP Agent shall no longer have any obligation to make any DIP Loans under the DIP Facility and shall be entitled to accelerate the DIP Facility; (ii) Pre-Petition First Lien Agent shall be entitled to immediately terminate the Debtors' right to use Cash Collateral by written notice thereof to counsel for the Debtors, counsel for any Committee, and the U.S. Trustee, without further notice, application or order of this Court, (iii) the Debtors shall be bound by all restrictions, prohibitions and other terms as provided in this Interim Financing Order, the DIP Credit Agreement and the other DIP Loan Documents and the Pre-Petition First Lien Loan Documents, and (iv) the DIP Agent shall be entitled to charge the default rate of interest under the DIP Facility and both the DIP Agent and the Pre-Petition First Lien Agent shall be entitled to take any act or exercise any right or remedy as provided in this

Interim Financing Order, the DIP Loan Documents, Pre-Petition First Lien Loan Documents or applicable law. The exercise of rights and remedies against the DIP Collateral or Pre-Petition Collateral is subject to the receipt by the Debtors, the Committee and the United States Trustee of no less than three (3) business prior written notice. During such notice period, the Debtors and Committee shall be entitled to seek an emergency hearing before this Court, during which they shall be allowed to assert that no Event of Default has actually occurred.

### *REQUEST FOR APPROVAL OF DIP FACILITY AND USE OF CASH COLLATERAL*.

21.     Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit out of the ordinary course of business and (c) obtaining credit with specialized priority or with security. If a debtor-in-possession cannot obtain post-petition credit on an unsecured basis, pursuant to section 364(c) of the Bankruptcy Code,[4] a court may authorize a debtor-in-possession to obtain credit or incur debt, repayment of which is entitled to superpriority administrative expense status or is secured by a senior lien on unencumbered property or a junior lien on encumbered property, or combination of the foregoing. Pursuant to section 364(d) of the Bankruptcy Code,[5] a court

---

[4]     Section 364(c) of the Bankruptcy Code provides as follows:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt—
>
> (1) with priority over any or all administrative expenses of the kind specified in section 503 (b) or 507 (b) of this title;
>
> (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

[5]     Section 364(d) of the Bankruptcy Code provides as follows:

> (1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—

may authorize a debtor-in-possession to obtain credit or incur debt secured by a senior or equal lien on property of the estate that is already subject to a lien.

22.    As a condition to entering into the DIP Credit Agreement and obtaining the Debtors' needed liquidity, the Debtors must obtain authorization, pursuant to sections 364(c) and (d) of the Bankruptcy Code, (a) to grant the DIP Agent, for the benefit of itself and the DIP Lenders, automatically perfected security interests in and liens upon all of the DIP Collateral, including, without limitation, all property constituting Cash Collateral, and (b) grant the DIP Obligations allowed superpriority administrative expense claim status in each of the Bankruptcy Cases and any Successor Cases.

## *APPROVAL UNDER SECTION 364(C) OF THE BANKRUPTCY CODE*

23.    The statutory requirement for obtaining post-petition credit under section 364(c) of the Bankruptcy Code is a finding, made after notice and hearing, that the debtors-in-possession are "unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense." *See* In re Garland Corp., 6 B.R. 456, 461 (B.A.P. 1st Cir. 1980) (secured credit under section 364(c)(2) is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained); In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (noting that "although a debtor is not required to seek credit from every possible source, a debtor must show that it has made a reasonable effort to seek other sources of credit available under section 364(a) & (b)"); In re Crouse Group, Inc., 71 B.R.

---

(A) the trustee is unable to obtain such credit otherwise; and

(B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d).

544, 549 (Bankr. E.D. Pa. 1987) (debtor seeking secured credit under section 364(c) of the Bankruptcy Code must prove that it was unable to obtain unsecured credit pursuant to section 364(b) of the Bankruptcy Code).

***THE DEBTORS WERE UNABLE TO OBTAIN NECESSARY POST-PETITION FINANCING ON AN UNSECURED BASIS UNDER 11 U.S.C. § 364(A) OR (B)***

24.     As set forth in the First Day Declaration, the Debtors could not have obtained a working capital facility of the type and magnitude required in these cases on an unsecured basis.

25.     To show that the credit required is not obtainable on an unsecured basis, a debtor need only demonstrate "by good faith effort that credit was not available without" the protections of section 364(c) of the Bankruptcy Code. Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986). Thus, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Id* at 1088; *see also* Ames, 115 B.R. at 40 (holding that debtor made a reasonable effort to secure financing where it approached four lending institutions, was rejected by two, and selected the least onerous financing option from the remaining two lenders). Moreover, where few lenders are likely to be able and willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for financing." In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd sub nom, Anchor Savings Bank FSB v. Sky Valley, Inc., 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).

26.     The Debtors submit that, other than the DIP Facility, there are no financing alternatives available under the circumstances. As this Court is undoubtedly aware, in

the current economic environment, the options for "cash flow" financing are extremely limited, particularly when sought by a distressed business.

27.     Moreover, as noted above and in further detail in the First Day Declaration, all of the Debtors' assets are encumbered by liens and security interests granted to the Pre-Petition Agents to secure approximately $166 million of outstanding loan obligations to those entities. Alternative financing in an amount sufficient to repay those creditors and provide additional liquidity is simply not available given the current state of the financial markets, the nature and state of the Debtors' business operations and the size of the financing required. Even if alternative debtor-in-possession financing were available on favorable terms and conditions and could be consummated in a time frame required to address the Debtors' liquidity needs, obtaining such financing would likely result in a difficult and protracted priming contest with the Pre-Petition First Lien Agent and Lenders, the results of which could not be predicted with certainty. Any uncertainty occasioned by protracted financing litigation would be extremely damaging to the Debtors, immediately jeopardizing their Chapter 11 cases at the outset.

### *APPROVAL OF PRIMING LIENS*

28.     If a debtor-in-possession is unable to obtain credit under the provisions of section 364(c) of the Bankruptcy Code, the debtor-in-possession may obtain credit secured by a senior or equal lien on property of the estate that is already subject to a lien, commonly referred to as a "priming lien." 11 U.S.C. § 364(d). Section 364(d) of the Bankruptcy Code, which governs the incurrence of postpetition debt secured by priming liens, provides that the court, after notice and hearing, may authorize the debtor-in-possession to obtain credit or incur debt secured by a senior or equal lien on property of the estate that is subject to a lien only if –

(A) the trustee is unable to obtain such credit otherwise; and

(B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).

29.     As discussed above, the Debtors lack alternative financing options. In light of that, and given the state of the credit markets, the Debtors have concluded that financing comparable to that provided by the DIP Agent and DIP Lenders under the DIP Facility is currently unobtainable without the priming of the pre-petition liens of the Pre-Petition First Lien Agent and the Pre-Petition Second Lien Agent. *See* In re Utah 7000, L.L.C., 2008 WL 2654919, *2 (Bankr. D. Utah July 3, 2008) (finding that the debtor unable to obtain financing without priming of prepetition liens); In re Mosello, 195 B.R. 277, 287 (Bankr. S.D.N.Y. 1996) (same); In re 495 Central Park Ave. Corp., 136 B.R. 626, 630-31 (Bankr. S.D.N.Y. 1992) (same); In re Beker Indus. Corp., 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (same).

30.     Thus, the Debtors are unable to obtain alternative post-petition financing through credit allowable on an unsecured basis and without granting priming liens. In these circumstances, the Debtors, in the exercise of their considered business judgment and in consultation with their professional advisors, have determined that the financing provided by the DIP Facility is the most favorable under the circumstances and provides the Debtors the liquidity necessary to maintain the going concern value of their business pending the conclusion of the Debtors' proposed sale process.

31.     In addition, the Debtors submit that the adequate protection to be provided to the Pre-Petition First Lien Agent and the Pre-Petition Second Lien pursuant to the Interim Financing Order, and as summarized below, is sufficient to approve the priming of their liens under section 364(d) of the Bankruptcy Code.

## THE DIP FACILITY IS NECESSARY TO PRESERVE ASSETS OF THE DEBTORS' ESTATES

32.     As stated above, the DIP Facility is essential so that the Debtors can preserve the value of their assets keep their operations running, and immediately instill their employees, authors and subscribers with confidence in the Debtors' ability to meet their obligations to these important stakeholders. Absent such confidence, the Debtors will not have the resources or support necessary to maintain operations and preserve their value as a going concern. Furthermore, the consent of the Pre-Petition First Lien Agent to the Debtors' use of Cash Collateral - which is of equal importance to the Debtors – is conditioned on the approval of the DIP Facility pursuant to the Interim Financing Order.

33.     The success of these cases thus depends on the confidence of the Debtors' employees, vendors, authors and subscribers. If the DIP Motion is denied or delayed, that confidence may be destroyed, and the success of these Chapter 11 cases might be irreparably damaged. The Debtors' need for access to the DIP Facility and the use of Cash Collateral is, therefore, immediate.

## APPLICATION OF THE BUSINESS JUDGMENT STANDARD

34.     After appropriate and extensive investigations and analysis, and robust, good faith, and arm's length negotiations among the Debtors, the DIP Agent, the DIP Lenders, the Pre-Petition First Lien Agent, and the Pre-Petition First Lien Lenders, the Debtors' management concluded that the DIP Facility and the use of Cash Collateral is the best alternative available in the circumstances of these cases. Bankruptcy courts routinely defer to a debtor's business judgment on most business decisions, including the decision to borrow money, unless such decision is arbitrary and capricious. *See* In re Trans World Airlines, Inc., 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that the interim loan, receivables facility and asset based facility

were approved because they "reflect[ed] sound and prudent business judgment on behalf of TWA . . . [were] reasonable under the circumstances and in the best interest of TWA and its creditors"); In re TM Carlton House Partners, LTD, 91 B.R. 349, 357 (Bankr. E.D. Pa. 1988) (holding that due to the debtor's distinct awareness of its own financial needs, the court would not second-guess its business judgment to put aside cash to effectuate a refinancing of its debts); cf. Group of Institutional Investors v. Chicago Mil. St. P. & Pac. Ry., 318 U.S. 523, 550 (1943) (holding that decisions regarding the rejection or assumption of a lease is left to the business judgment of the debtor); In re Simasko Prod. Co., 47 B.R. 444, 449 (D. Colo. 1985) ("Business judgments should be left to the board room and not to this Court."); In re Lifeguard Indus. Inc., 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (same); In re Curlew Valley Assocs., 14 B.R. 506, 513-14 (Bankr. D. Utah 1981) (holding that courts generally will not second-guess a debtor-in-possession's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the Code"). In fact, "[m]ore exacting scrutiny would slow the administration of the Debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985).

35.    The Debtors have exercised sound business judgment in determining that the combination of the immediate use of Cash Collateral along with a post-petition credit facility is appropriate and have satisfied the legal prerequisites to incur debt under the DIP Facility. The terms of the DIP Credit Agreement are fair and reasonable and are in the best interests of the Debtors' estates. Accordingly, the Debtors should be granted authority to enter into the DIP Credit Agreement and obtain funds from the DIP Lenders on the secured, administrative

"superpriority" basis described above, pursuant to sections 364(c) and (d) of the Bankruptcy Code.

## *HIGHLIGHTED PROVISIONS UNDER RULE 4001-2*

36.     Local Rule 4001-2(a) states in pertinent part that:

(i) All Financing Motions must (a) recite whether the proposed form of order and/or underlying cash collateral stipulation or loan agreement contains any provision of the type indicated below, (b) identify the location of any such provision in the proposed form of order, cash collateral stipulation and/or loan agreement and (c) justify the inclusion of such provision:

(A) Provisions that grant cross-collateralization protection (other than replacement liens or other adequate protection) to the prepetition secured creditors (i.e., clauses that secure prepetition debt by postpetition assets in which the secured creditor would not otherwise have a security interest by virtue of its prepetition security agreement or applicable law);

(B) Provisions or findings of fact that bind the estate or other parties in interest with respect to the validity, perfection or amount of the secured creditor's prepetition lien or the waiver of claims against the secured creditor without first giving parties in interest at least seventy-five (75) days from the entry of the order and the creditors' committee, if formed, at least sixty (60) days from the date of its formation to investigate such matters;

(C) Provisions that seek to waive, without notice, whatever rights the estate may have under 11 U.S.C. § 506(c);

(D) Provisions that immediately grant to the prepetition secured creditor liens on the debtor's claims and causes of action arising under 11 U.S.C. §§ 544, 545, 547, 548 and 549;

(E) Provisions that deem prepetition secured debt to be postpetition debt or that use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt, other than as provided in 11 U.S.C. § 552(b);

(F) Provisions that provide disparate treatment for the professionals retained by a creditors' committee from those professionals retained by the debtor with respect to a professional fee carve-out; and

(G) Provisions that prime any secured lien without the consent of that lienor.

Del. Bankr. Local Rule 4001-2(a)(i).

37.     Pursuant to Local Rule 4001-2(a)(i)(B), paragraph 15 of the Interim Financing Order, requires that any Challenge must be commenced, by the Committee or any other party in interest (besides the Debtors) that obtains the requisite standing, within a period of forty-four (44) days from the Petition Date, to (a) challenge in any manner the Pre-Petition First Lien Indebtedness, and/or assert claims or causes of action of any nature in any way arising out of or relating to the Pre-Petition First Lien Indebtedness or the Pre-Petition First Lien Loan Documents, or (b) assert or allege any other matters in any way arising out of or relating to the Pre-Petition First Lien Indebtedness or the Pre-Petition First Lien Loan Documents, or (c) challenge the extent, legality, validity, priority, perfection and/or enforceability of any of the Pre-Petition First Lien Secured Parties' liens upon and security interests in the Pre-Petition Collateral pursuant to the Bankruptcy Code. If a properly commenced Challenge is not timely filed within such forty-four (44) day period set forth above, as applicable, (i) the Debtors' Stipulations contained in paragraph C of the Interim Financing Order shall be irrevocably binding on the Debtors' estates, any Committee and all parties-in-interest and any and all successor in interest as to any of the foregoing (including any Chapter 11 or Chapter 7 trustee or any estate representative) and such parties shall thereafter be forever barred from bringing any Challenge, (ii) the Pre-Petition First Lien Indebtedness shall be deemed allowed, on a final basis, in full and the Pre-Petition First Lien Secured Parties' security interests in and liens upon the Pre-Petition Collateral shall be recognized and allowable as legal, valid, binding, in full force

and effect, non avoidable, perfected and senior to all other liens (subject only to Permitted Prior Liens and the DIP Liens) upon and claims against the Pre-Petition Collateral and the DIP Collateral with respect to all parties in the Bankruptcy Cases including any Successor Cases and not be subject to any counterclaims, setoff, recoupment, deduction, or claim of any kind or any defenses, or any further objection or challenge by any party at any time, including any subsequently appointed Chapter 11 or Chapter 7 trustee or estate representative, and (iii) the Pre-Petition First Lien Agent and the Pre-Petition First Lien Secured Parties' and each of their respective agents, officers, directors, employees, attorneys, professionals, successors, and assigns shall be deemed released and discharged from all claims and causes of action arising under the Bankruptcy Code, state or other applicable law or otherwise, arising out of, relating to or in connection with the parties' relationship with the Debtors, the Bankruptcy Cases, Pre-Petition First Lien Loan Documents and shall not be subject to any further objection or challenge by any party at any time, including any subsequently appointed Chapter 11 or Chapter 7 trustee or estate representative. The Interim Order provides that the time period described above for the filing of a Challenge is subject to approval at the Final Financing Order hearing.

38. With respect to the priming DIP Liens, the Debtors further submit that, pursuant to Section 6.1(a) of the Intercreditor Agreement, under these circumstances (i.e., where the Pre-Petition First Lien Agent does not object to the priming of the liens securing the Pre-Petition First Lien Obligations), the Pre-Petition Second Lien Agent has agreed for itself and the other Pre-Petition Second Lien Lenders that it will raise no objection to the grant of priming liens to secure the DIP Facility. *See* Exhibit B hereto, page 23.

39. Pursuant to Local Rule 4001-2(a)(i)(C), paragraph 19 of the Interim Financing Order provides that, with the exception of the Carve Out, the Debtors and the Debtors' estates waive for the benefit and in favor of the Pre-Petition First Lien Secured Parties the right to

surcharge the Pre-Petition Collateral, pursuant to section 506(c) of the Bankruptcy Code and that the Pre-Petition First Lien Secured Parties shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, but such waiver and entitlement shall not occur until the entry of the Final Financing Order.

40. Pursuant to Local Rule 4001-2(a)(i)(D), paragraph 3.f.iii of the Interim Financing Order provides that the DIP Liens shall attach to Avoidance Actions, but that such attachment shall not occur until the entry of the Final Financing Order.

41. Pursuant to Local Rule 4001-2(a)(i)(F), paragraph 30 of the Interim Financing Order and Section 2.25(a) of the DIP Credit Agreement provide that the Carve Out is for use only by Professionals retained by the Debtors. It is not clear that a Committee will be formed in these Bankruptcy Cases given the relatively small amount of unsecured debt owed by the Debtors.

42. Pursuant to Local Rule 4001-2(a)(i)(G), Paragraph 3.f.iii, of the Interim Financing Order provides that the DIP Liens shall be senior, priming, liens, subject only to the Carve Out, pursuant to section 364(d)(1) of the Bankruptcy Code. While the Pre-Petition First Lien Agent does not object to the grant of the DIP Liens and the priming of the liens that the Pre-Petition First Lien Obligations, the Pre-Petition Second Lien Agent has not expressly agreed to the terms of the DIP Facility or the grant of priming liens to secure the DIP Facility.

43. The justification for the provisions of the DIP Facility for which disclosure is required pursuant to Local Rule 4001-2 is the critical need for this financing. As discussed in detail in the First Day Declaration, the Debtors were unable to secure postpetition financing on terms more favorable than that obtained from the DIP Lender and the DIP Agent and such financing together with the use of Cash Collateral is critical to the maximization of recoveries for the Debtors' creditors. Indeed, without the proposed DIP Financing and

consensual use of Cash Collateral, the Debtors' ability to maximize the value of their estates for all stakeholders may be fatally compromised. Accordingly, the facts and circumstances of these cases justify the inclusion of the terms that require disclosure under Local Rule 4001-2, and these terms of the DIP Credit Agreement should be approved.

44. The Debtors further submit that the shortened time frame for the filing of a Challenge – within forty-four days of the Petition Date - is necessary given the specific circumstances of these Bankruptcy Cases. As noted above, an Event of Default will occur if the Auction does not occur within forty-five days of the Petition Date, and the DIP Lender and Pre-Petition First Lien Lenders advised the Debtors that they would be unwilling to provide the DIP Facility and permit the use of Cash Collateral if the possibility existed that the Challenge period would extend past the Auction date. The Interim Financing Order provides that the proposed deadline for the filing of a Challenge is subject to approval in the Final Financing Order. [To be expanded.]

## *REQUEST FOR CONSENSUAL USE OF CASH COLLATERAL*

45. The Debtors will require the ability to use cash on hand and the proceeds of accounts receivable to maintain the operation of their businesses and preserve their value as going concerns. These essential items, however, constitute part of the Pre-Petition Collateral and are Cash Collateral and, therefore, may not be used in support of the Debtors' ongoing business activities absent compliance with section 363(c)(2) of the Bankruptcy Code.

46. Section 363(c)(2) of the Bankruptcy Code provides that:

(2) The trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless—

(A) each entity that has an interest in such cash collateral consents[.]

11 U.S.C. § 363(c)(2).

47. In the instant cases, the Pre-Petition First Lien Agent is permitting the Debtors' use of Cash Collateral in accordance with the Interim Financing Order. Pursuant to Section 6.1(a) of the Intercreditor Agreement, under these circumstances (i.e., where the Pre-Petition First Lien Agent has granted such permission), the Pre-Petition Second Lien Agent has agreed for itself and the other Pre-Petition Second Lien Lenders that it will raise no objection to the Debtors' use of Cash Collateral. *See* Exhibit B hereto, page 23. As a result, and because the such use is essential to the preservation of the Debtors' estates, the Court should approve the Debtors' use of Cash Collateral under section 363(c)(2) of the Bankruptcy Code.

### *APPROVAL OF ADEQUATE PROTECTION*

48. In exchange for the Debtors' use of the Pre-Petition Collateral, including Cash Collateral, and its priming of the liens and security interests of the Pre-Petition Agents (collectively, the "Pre-Petition Liens"), (i) the Pre-Petition First Lien Agent, for the benefit of the Pre-Petition First Lien Secured Parties, is entitled to adequate protection, and (ii) the Pre-Petition Second Lien Agent, for the benefit of the Pre-Petition Second Lien Secured Parties, is being provided adequate protection, solely to the extent it is determined that the Pre-Petition Second Lien Agent is entitled thereto, in each case for any diminution in the value of their respective interests in the Pre-Petition Collateral (calculated in accordance with section 506(a) of the Bankruptcy Code), resulting from the (a) provisions of the Interim Financing Order granting first priority and/or priming liens on the Pre-Petition Collateral to the DIP Agent, for the benefit of the DIP Lenders, with respect to the DIP Facility; (b) use of the Cash Collateral, (c) the use, sale, lease, or depreciation or other diminution in value of the Pre-Petition Collateral, or (d) the imposition of the automatic stay under section 362(a) of the Bankruptcy Code or otherwise

pursuant to sections 361(a), 363(c), 364(c) and 364(d)(1) of the Bankruptcy Code (the amount of any such diminution being referred to hereafter as the "Adequate Protection Obligations").

49.     The Debtors propose to provide the Pre-Petition First Lien Agent, for the benefit of itself and the Pre-Petition First Lien Lenders, and the Pre-Petition Second Lien Agent, for the benefit of itself and the Pre-Petition Second Lien Lenders, with adequate protection in accordance with sections 361, 363, and 364 of the Bankruptcy Code. To that end, the Debtors request the Court approve, as of the Petition Date, certain protections in respect of the Adequate Protection Obligations. Such adequate protection, as described more fully in the Interim Financing Order, is summarized below.

(a)     First Lien Adequate Protection Liens. As adequate protection for any Adequate Protection Obligations owed to the Pre-Petition First Lien Agent or Pre-Petition First Lien Lenders, the Debtors propose to grant to the Pre-Petition First Lien Agent, for the benefit of itself and the Pre-Petition First Lien Lenders, a continuing valid, binding, enforceable, and perfected postpetition security interests in and lien on the DIP Collateral (the "First Lien Adequate Protection Liens"), which shall be junior in all respects to the DIP Liens, the Permitted Prior Liens and the Carve Out.

(b)     Second Lien Adequate Protection Liens. As adequate protection for any Adequate Protection Obligations owed to the Pre-Petition Second Lien Agent or Pre-Petition Second Lien Lenders, the Debtors propose to grant to the Pre-Petition Second Agent, for the benefit of itself and the Pre-Petition Second Lien Lenders, a continuing valid, binding, enforceable, and perfected postpetition security interests in and lien on the DIP Collateral (the "Second Lien Adequate Protection Liens" and together with the First Lien Adequate Protection Liens, the "Adequate Protection Liens"), which shall be junior in all respects to (i) the DIP

Liens, (ii) First Lien Adequate Protection Liens, (iii) the liens of the Pre-Petition First Lien Agent for the benefit of the Pre-Petition First Lien Lenders, (iv) the Permitted Prior Liens and (v) the Carve Out.

(c)     First Lien Adequate Protection Claim.    As further adequate protection, the Pre-Petition First Lien Agent, for the benefit of the Pre-Petition First Lien Secured Parties, is hereby granted an allowed administrative claim (the "First Lien Adequate Protection Claim") against the Debtors' estates under sections 503 and 507(b) of the Bankruptcy Code to the extent that the First Lien Adequate Protection Liens do not adequately protect the diminution in the value of the Pre-Petition First Lien Agent's and Lenders' interest in the Pre-Petition Collateral, which First Lien Adequate Protection Claim shall be subject and subordinate only to the DIP Superpriority Claim and the Carve Out and shall have priority over all administrative expense claims and unsecured claims against the Debtors or their estates, which are now existing, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 364, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114 of the Bankruptcy Code.

(d)     Second Lien Adequate Protection Claim.    As further adequate protection, the Pre-Petition First Second Agent, for the benefit of the Pre-Petition Second Lien Secured Parties, is hereby granted, to the extent it is later determined that the Pre-Petition Second Lien Agent is entitled thereto, an allowed administrative claim (the "Second Lien Adequate Protection Claim" and together with the First Lien Adequate Protection Claim, the "Adequate Protection Claims") against the Debtors' estates under sections 503 and  507(b) of the Bankruptcy Code to the extent that the Second Lien Adequate Protection Liens do not adequately

protect the diminution in the value of the Pre-Petition Second Lien Agent's and Lenders' interest in the Pre-Petition Collateral, which Second Lien Adequate Protection Claim shall be subject and subordinate only to the DIP Superpriority Claim and the Carve Out and shall have priority over all administrative expense claims and unsecured claims against the Debtors or their estates, which are now existing, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 364, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114 of the Bankruptcy Code.

(e) Additional Adequate Protection. As further adequate protection, and in consideration, and as a requirement, for the Adequate Protection Obligations, the Debtors shall pay or reimburse the Pre-Petition First Lien Agent for any and all of its accrued and unpaid reasonable fees, costs, expenses and charges payable under the Pre-Petition First Lien Loan Documents, including, without limitation, the reasonable and documented fees and expenses of the Pre-Petition First Lien Agent as provided for in Section 11.14.1 of the Pre-Petition First Lien Credit Agreement, whether accrued pre-petition or post-petition, all without further notice, motion or application to, order of, or hearing before, this Court, provided that such payments shall be made not earlier than ten (10) days following receipt by the Debtors, the United States Trustee and, if appointed, the Committee or its counsel, of a written invoice (subject in all respects to applicable privilege or work product doctrines).

50. The Debtors believe that the proposed adequate protection is fair and reasonable. The Pre-Petition First Lien Agent does not object that the adequate protection summarized above and provided for in the Interim Financing Order is sufficient to allow the Debtors to use Cash Collateral. The Debtors respectfully submit, moreover, that the Second Lien

Adequate Protection Liens to be granted to the Pre-Petition Second Lien Agent is sufficient protection for any Adequate Protection Obligations. Furthermore, the priming of the Pre-Petition Liens will enable the Debtors to obtain the DIP Facility and the use of Cash Collateral, which is vital to the Debtors' estates.

51.     Accordingly, based on the foregoing, the Debtors respectfully request that the Court authorize the Debtors to provide certain adequate protections in accordance with the terms set forth in the Interim Financing Order.

## *GOOD FAITH*

52.     The Debtors submit that the terms and conditions of the DIP Facility and the DIP Credit Agreement, and the fees paid and to be paid thereunder, are fair, reasonable, and the best available to the Debtors under the circumstances. As stated above, the Debtors, the DIP Agent, the DIP Lenders, the Pre-Petition First Lien Agent, and the Pre-Petition First Lien Lenders negotiated the terms and conditions of the DIP Credit Agreement and the use of Cash Collateral in good faith and at arm's length. Moreover, the Debtors' decision to enter into the DIP Credit Agreement was an exercise of the Debtors' prudent business judgment. Therefore, the DIP Agent, DIP Lenders, the Pre-Petition First Lien Agent, and the Pre-Petition First Lien Lenders should be accorded the benefits of section 364(e) and 363(m) of the Bankruptcy Code to the extent any or all of the provisions related to the DIP Credit Agreement or the use of Cash Collateral, or any interim or final order of this Court pertaining thereto, are hereafter modified, vacated, stayed or terminated by subsequent order of this or any other court.

## *REQUEST FOR MODIFICATION OF THE AUTOMATIC STAY*

53.     The Interim Financing Order contemplates a modification of the automatic stay established pursuant to section 362 of the Bankruptcy Code, to the extent necessary, to effectuate all of the terms and provisions of the Interim Financing Order, including, without

limitation, to (a) permit the Debtors to grant the DIP Liens, the Adequate Protection Liens, the DIP Superpriority Claim, and the First Lien Adequate Protection Claim; (b) permit the Debtors to perform such acts as the DIP Agent or the Pre-Petition First Lien Agent may request in its sole discretion to assure the perfection and priority of the liens granted herein; (c) permit the Debtors to incur all liabilities and obligations to the DIP Agent, the DIP Lenders, the Pre-Petition Agents, and the Pre-Petition Lenders under the DIP Loan Documents, the DIP Facility, and the Interim Financing Order; and (d) authorize the Debtors to pay and the DIP Agent, the DIP Lenders, the Pre-Petition First Lien Agent, and the Pre-Petition First Lien Lenders to retain and apply payments made in accordance with the terms of the Interim Financing Order.

54.     Stay modification provisions of this type are customary features of post-petition debtor-in-possession financing facilities and, in the Debtors' business judgment, are reasonable under the circumstances. Accordingly, the Court should modify the automatic stay to the extent contemplated by the Interim Financing Order.

### *REQUEST TO WAIVE BANKRUPTCY RULES 6003(B), 6004(A), AND 6004(H)*

55.     In order to successfully implement the foregoing, the Debtors respectfully request that the Court waive the notice requirements provided for by Bankruptcy Rule 6004(a), the twenty-day stay provided for by Bankruptcy Rule 6003(b), and the ten-day stay provided for by Bankruptcy Rule 6004(h). The Debtors believe, for the reasons set forth above, that ample justification exists for the Court to waive Bankruptcy Rule 6003(b), 6004(a), and 6004(h).

### *REQUEST FOR FINAL HEARING*

56.     Pursuant to Bankruptcy Rule 4001(c)(2), the Debtors request the Court to set a date for the Final Financing Hearing that is no later than 25 days from the Petition Date.

## *NOTICE*

57.    Notice of the Interim Hearing and the relief requested in this Motion has been provided by the Debtors to: (i) the Office of the United States Trustee for Region 3, serving the District of Delaware; (ii) the forty (40) largest unsecured creditors; (iii) all of the Debtors' secured creditors of record, other than the Pre-Petition Agents; (iv) counsel to the Pre-Petition Agents; (v) all of the Debtors' landlords, (vi) all applicable federal, State and local taxing authorities, and (vii) all parties that requested notice pursuant to Bankruptcy Rule 2002 prior to the filing of the Motion.    The parties have made reasonable efforts to afford the best notice possible under the circumstances and such notice is good and sufficient to permit the interim relief set forth in the Interim Financing Order.

## *NO PRIOR REQUEST*

58.    No prior request for the relief sought in this Motion has been made to this or any other court.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

WHEREFORE, the Debtors respectfully request that the Court (i) enter an order substantially in the form of the Interim Financing Order annexed hereto as **Exhibit A**; (ii) schedule the Final Financing Hearing, (iii) after the Final Financing Hearing, enter a Final Order substantially in the form of the Interim Financing Order and as filed with the Court prior to the Final Financing Hearing; and (iv) grant such other and further relief as is just and proper.

Dated: September 21, 2010
      Wilmington, Delaware

Derek C. Abbott (Bar No. 3376)
dabbott@mnat.com
Chad A. Fights (Bar No. 5006)
cfights@mnat.com
Alissa T. Gazze (Bar. No. 5338)
agazze@mnat.com
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
Telephone: (302) 658-9200
Facsimile: (302) 658-3989

-and-

John F. Ventola
jventola@choate.com
Lisa E. Herrington
lherrington@choate.com
CHOATE, HALL & STEWART LLP
Two International Place
Boston, MA 02110
Telephone: (617) 248-5000
Facsimile: (617) 248-4000

*Proposed Counsel to Debtors and Debtors in Possession*