# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

IN RE:

TPH SELLER, INC. (f/k/a THOMPSON
PUBLISHING HOLDING CO., INC.), *et al.*,[1]

Debtors.

Chapter 11

Case No. 10-13070 (PJW)

Jointly Administered

## DISCLOSURE STATEMENT FOR THE DEBTORS'
## FIRST AMENDED PLAN OF LIQUIDATION UNDER CHAPTER 11
## OF THE BANKRUPTCY CODE, DATED MARCH 28, 2011

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Derek C. Abbott (Bar No. 3376)
Chad A. Fights (Bar No. 5006)
Alissa T. Gazze (Bar No. 5338)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
Telephone: (302) 658-9200
Facsimile: (302) 658-3989

-and-

CHOATE, HALL & STEWART LLP
John F. Ventola
Sean M. Monahan
Two International Place
Boston, MA 02110
Telephone: (617) 248-5000
Facsimile: (617) 248-4000

*Counsel to Debtors and Debtors in Possession*

---

[1] The Debtors are the following entities (followed by the last four digits of their tax identification numbers): TPH Seller, Inc. (f/k/a Thompson Publishing Holding Co. Inc.) (5470), AHC Seller LLC (f/k/a AHC Media LLC) (2136), AES Seller, Inc. (f/k/a Alex eSolutions, Inc.) (5725), TPG Seller, Inc. (f/k/a Thompson Publishing Group, Inc.) (2093), PI Seller, Inc. (f/k/a The Performance Institute, Inc.) (8059), TPG AES Holding Seller, Inc. (f/k/a TPG AES Holding Co., Inc.) (1658), and TPD Seller, LLC (f/k/a Thompson Publishing Development, LLC) (2093), c/o P.O. Box 26185, Tampa, FL 33623-6185.

Table of Contents

**ARTICLE I BACKGROUND** ...............................................................................................**9**

  A.        The Debtors' Businesses.............................................................................................9

            (1)      Overview.........................................................................................................9

            (2)      The Debtors' Business Divisions................................................................10

  B.        The Debtors' Prepetition Financing.........................................................................12

  C.        Events Leading to Chapter 11 Cases ......................................................................14

  D.        The Sale Process......................................................................................................17

**ARTICLE II THE INSTANT CASES** ............................................................................................**18**

  A.        The Petition Date .....................................................................................................18

  B.        Schedules of Assets and Liabilities; Statements of Financial
            Affairs; Monthly Operating Reports; Meeting of Creditors...................................18

  C.        Significant "First Day" Motions..............................................................................19

  D.        Post-Petition Financing............................................................................................22

  E.        The Sale Motion ......................................................................................................24

  F.        Change of Debtors' Names......................................................................................26

  G.        Professionals Retained in These Cases....................................................................27

  H.        Claims Bar Dates .....................................................................................................28

**ARTICLE III CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS** ...............**29**

  A.        In General ................................................................................................................29

  B.        U.S. Federal Income Tax Consequences to the Debtors .........................................31

  C.        U.S. Federal Income Tax Consequences to Holders of Allowed
            and Disputed Claims................................................................................................32

  D.        U.S. Federal Income Tax Consequences to Holders of Interests ...........................32

  E.        Backup Withholding and Information Reporting.....................................................33

**ARTICLE IV THE LIQUIDATING PLAN................................................................................33**

A.    Overview of the Plan ...........................................................................................33

B.    Administrative Consolidation...............................................................................36

C.    Summary of the Plan ...........................................................................................37

      (1)    Allowed Administrative Expenses.............................................................37

      (2)    Intercompany Claims.................................................................................39

      (3)    Class 1:  Allowed Secured Claims.............................................................39

      (4)    Class 2:  Allowed Priority Claims. ...........................................................39

      (5)    Class 3:  General Unsecured Claims...........................................................39

      (6)    Class 4:  Allowed Deficiency Claims of First Lien
            Secured Parties............................................................................................40

      (7)    Class 5:  Allowed Deficiency Claims of Second Lien
            Claimholders. .............................................................................................41

      (8)    Class 6:  Interests. .....................................................................................41

D.    The Debtors' Remaining Assets ...........................................................................41

E.    Investment of the Assets of the Post-Confirmation Estate ....................................41

F.    Method of Distributions Under the Plan................................................................43

      (1)    Required Tax Information...........................................................................43

      (2)    Distributions..............................................................................................43

      (3)    Allowed Claims Reserve............................................................................45

G.    Provisions for Treatment of Disputed Claims and Interests...................................45

H.    Executory Contracts and Unexpired Leases .........................................................46

I.    Effect of Confirmation.........................................................................................47

J.    Effective Date of the Plan.....................................................................................48

| | | | |
|---|---|---|---|
| K. | | Implementation of the Plan | 48 |
| L. | | Duties and Responsibilities of Liquidating Supervisor | 50 |
| M. | | Summary of Other Provisions of the Plan | 52 |
| | (1) | Classes | 52 |
| | (2) | Retention of Professionals. | 52 |
| | (3) | Injunction. | 53 |
| | (4) | Exculpation. | 54 |
| | (5) | Release. | 54 |
| | (6) | Retiree Benefits. | 56 |
| | (7) | Amendment, Modification, Withdrawal or Revocation of the Plan | 57 |
| | (8) | Effectuating Documents and Further Transactions | 58 |
| | (9) | Exemption from Transfer Taxes. | 58 |
| | (10) | Fees and Expenses of Professionals. | 58 |
| | (11) | Payment of Statutory Fees and Costs of Administering the Estate. | 59 |

**ARTICLE V ACCEPTANCE AND CONFIRMATION OF THE PLAN** .............................59

| | | | |
|---|---|---|---|
| A. | | Voting Procedures | 60 |
| | (1) | Submission of Ballots | 60 |
| | (2) | Incomplete Ballots | 61 |
| | (3) | Waiver of Defects, Irregularities, etc. | 61 |
| B. | | Confirmation of the Plan | 62 |
| | (1) | Confirmation Hearing | 62 |
| | (2) | Requirements for Confirmation of the Plan | 63 |

**ARTICLE VI ALTERNATIVES TO LIQUIDATING PLAN**....................................................**64**

**ARTICLE VII CONCLUSION AND RECOMMENDATION**...............................................**66**

## INTRODUCTION

The Debtors have filed this Disclosure Statement (the "Disclosure Statement") pursuant to Section 1125 of the Bankruptcy Code with respect to the Debtors' First Amended Plan of Liquidation Under Chapter 11 of the Bankruptcy Code, dated March 28, 2011 (as may be further amended and supplemented, the "Plan"), and in connection with the Debtors' solicitation of votes to accept the Plan, as it may be altered, amended, or supplemented from time to time, from holders of Class 3 Allowed General Unsecured Claims and Class 4 Allowed Deficiency Claims. A copy of the Plan is attached hereto as Exhibit A. Most words or phrases used in this Disclosure Statement shall have their usual and customary meaning. Capitalized terms defined in the Plan and used in this Disclosure Statement shall have the meanings attributed to them in Section 1 of the Plan.

The Plan is a liquidation plan, and does not contemplate the financial rehabilitation of the Debtors or the continuation of their businesses. The Debtors have liquidated substantially all of their assets through a going-concern sale of the Debtors' businesses pursuant to Section 363 of the Bankruptcy Code as further described herein. To liquidate the Debtors' remaining assets and, ultimately, to effectuate the distribution of such assets to Creditors, the Plan provides for the appointment of a Liquidating Supervisor on the Effective Date. After the Effective Date, the Liquidating Supervisor will review and, if appropriate, object to Claims and/or Interests against the Debtors, and liquidate the Debtors' remaining assets, with the proceeds of such assets and revenues to be distributed to Creditors as set forth in the Plan. On a subsequent date, to be determined by the Liquidating Supervisor, the Debtors will be dissolved.

The following table sets forth a brief summary of the classification, treatment and estimated recoveries of Claims and Interests under the Plan. The information set forth in such table is for convenience only and is qualified in its entirety by the contents of the Plan:

4790137

| Class | Treatment | Entitled to Vote? | Estimated Recovery |
|-------|-----------|-------------------|--------------------|
| Class 1 – Allowed Secured Claims | Class 1 consists of all Allowed Secured Claims against the Debtors. The Allowed Claims in Class 1 have been previously satisfied by the Debtors or were assumed by the Purchaser under, and are deemed paid in full pursuant to, the Asset Purchase Agreement and the Sale Order. Although holders of Allowed Claims in Class 1 will receive no property under the Plan, Class 1 is Unimpaired. | No | N/A |
| Class 2 – Allowed Priority Claims | Class 2 consists of all Allowed Priority Claims against the Debtors. The Allowed Claims in Class 2 have been assumed by the Purchaser under, and are deemed paid in full pursuant to, the Asset Purchase Agreement and the Sale Order. Although holders of Allowed Claims in Class 2 will receive no property under the Plan, Class 2 is Unimpaired. | No | N/A |
| Class 3 – General Unsecured Claims | Class 3 Consists of all Allowed General Unsecured Claims against the Debtors. Each holder of an Allowed Claim in Class 3 shall be entitled to receive, subject to the terms of the Plan and in full satisfaction, settlement, release and discharge of, and in exchange for such Allowed Claim, its *Pro Rata* Share of the Net Creditor Payment Fund; provided, that no Distribution shall be made to holders of General Unsecured Claims in Class 3 unless and until all Allowed Administrative Expenses and all Professional Fee Claims have been paid in full, reserved or otherwise resolved, and/or included in or accounted for in the Distribution at issue. Class 3 is Impaired. | Yes | 20% |
| Class 4 – Allowed Deficiency Claims of First Lien Secured Parties | Class 4 consists of all Allowed Deficiency Claims of the First Lien Secured Parties against the Debtors. Each holder of an Allowed Claim in Class 4 shall be entitled to receive, subject to the terms of the Plan and in full satisfaction, settlement, release and discharge of, and in exchange for such Allowed Claim, its *Pro Rata* Share of Available Cash; provided, that (a) no Distribution shall be made to holders of Allowed Deficiency Claims in Class 4 unless and until all Allowed Administrative Expenses and all Professional Fee Claims have been paid in full, reserved or otherwise resolved, and/or included in or accounted for in the Distribution at issue; and (b) notwithstanding anything to the contrary set forth in the Plan, holders of Class 4 Allowed Deficiency Claims shall not be entitled to receive any Distribution from the Creditor Payment Fund. Class 4 is Impaired. | Yes | 0% |

| Class | Treatment | Entitled to Vote? | Estimated Recovery |
|-------|-----------|-------------------|--------------------|
| Class 5 – Allowed Deficiency Claims of Second Lien Claimholders | Class 5 consists of all Allowed Deficiency Claims of the Second Lien Claimholders against the Debtors. Holders of Allowed Claims in Class 5 shall not be entitled to receive any distribution on account of such Claims. Class 5 is Impaired. | No | 0% |
| Class 6 – Interests | Class 6 consists of all Interests in the Debtors. Holders of Interests in Class 6 shall not be entitled to receive any distribution on account of such Interests. Class 6 is Impaired. | No | 0% |

The Debtors currently have on hand approximately $1,150,000 in cash (as set forth in the Debtors' February 2011 Monthly Operating Report), of which (a) $100,000 has been set aside in the Creditor Payment Fund for distribution to holders of Class 3 General Unsecured Claims in accordance with the provisions of the Plan and (b) $750,000 has been set aside (the "Wind-Down Budget") for the payment of professional fees and statutory fees payable to the Office of the United States Trustee. The Debtors expect that the Wind-Down Budget will be sufficient to pay such fees in full, and thus the entire amount of the Creditor Payment Fund will be available for distribution to holders of Class 3 Allowed General Unsecured Claims. In the event that the Wind-Down Budget proves insufficient to pay such fees in full, the Liquidating Supervisor will pay such fees from Available Cash and the Creditor Payment Fund, which would reduce the amount available for distribution to holders of Class 3 Allowed General Unsecured Claims.

The Debtors estimate that the aggregate amount of Allowed General Unsecured Claims unpaid on the Effective Date will be approximately $500,000 and project that the recovery of holders of Class 3 Allowed General Unsecured Claims is 20%. The Debtors expect that there will not be sufficient funds to make a meaningful distribution to holders of Class 4 Deficiency Claims. Indeed, the estimated recovery of holders of Class 4 Deficiency Claims is 0% and it is unlikely that such percentage will be increased as the Debtors have no other known assets of any

3

material value and transferred substantially all of their assets (including all preference claims arising under Section 547 of the Bankruptcy Code) to the Purchaser pursuant to the Asset Purchase Agreement. In the event that there are excess funds in the Wind-Down Budget after the payment of professional fees and statutory fees payable to the Office of the United States Trustee in full, such funds would be distributed to holders of Class 4 Allowed Deficiency Claims.

This Disclosure Statement is provided to all known holders of Claims entitled to vote to accept or reject the Plan. The purpose of this Disclosure Statement is to provide the holders of such Claims with sufficient and adequate information with respect to the Plan to enable such holders to make an informed decision in exercising their right to vote on the Plan. Accordingly, this Disclosure Statement discusses, among other things, a history of the Debtors' businesses, the classification of claims and interests against the Debtors, the treatment of such claims and interests, and voting instructions. This Disclosure Statement also contains a summary and analysis of the Plan.

**Pursuant to Bankruptcy Rule 3018, for purposes of this Disclosure Statement and the Plan, including voting on the Plan, holders of Claims entitled to vote to accept or reject the Plan will be determined as of March 29, 2011 (the "Record Date"). Unless a party holding such a Claim is the holder of record of such Claim on the date upon which this Disclosure Statement is approved by the Bankruptcy Court, such party will not be entitled to vote to accept or reject the Plan. Holders of record will be determined by reference to (a) with respect to the holders of Class 3 General Unsecured Claims, the records maintained by the Debtors, and (b) with respect to the holders of Class 4 Deficiency Claims, the records maintained by the First Lien Administrative Agent. The Debtors and the Liquidating Supervisor (as defined below) shall be entitled to rely on such records to**

4

**determine the identity of the holders of such Claims. Prior to the Confirmation Hearing, notice of the Record Date will be (a) provided to all known holders of such Claims and (b) published in the national edition of the *Wall Street Journal*.**

A ballot to be used for voting to accept or reject the Plan is enclosed. Instructions for completing and returning the ballot are printed on the ballot itself. **IN ORDER FOR A BALLOT TO COUNT, IT MUST BE RECEIVED BY EPIQ BANKRUPTCY SOLUTIONS, LLC (the "Voting Agent") AT THE ADDRESS STATED ON THE BALLOT NO LATER THAN 4:00 P.M. (EASTERN TIME) ON MAY 4, 2011.**

Under Section 1126(b) of the Bankruptcy Code, only classes of Claims or Interests that are "impaired" under the Plan, as defined by Section 1124 of the Bankruptcy Code, will be entitled to vote on the Plan. As set forth in greater detail below, only holders of Class 3 Allowed General Unsecured Claims and Class 4 Allowed Deficiency Claims are entitled to vote on the Plan. All other classes of Claims and Interests are either (a) Unimpaired under the Plan and therefore are deemed conclusively to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code, or (b) are Impaired under the Plan and are not entitled to receive any distribution under the Plan on account of such Claims or Interests, and therefore are deemed conclusively to have rejected the Plan pursuant to Section 1126(g) of the Bankruptcy Code.

Thus, in order for the Plan to be accepted and thereafter confirmed by the Bankruptcy Court, at least one Impaired Class entitled to vote must accept the Plan and, as discussed further in Article V of this Disclosure Statement, the Plan must meet the "cram down" requirements set forth in Section 1129(b) of the Bankruptcy Code. Each Class entitled to vote will have accepted the Plan if (a) holders of votes representing at least two-thirds in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (b) holders of votes representing more than one half in number of the Allowed Claims actually voting in such Class have voted to

5

accept the Plan. This Disclosure Statement is intended to assist you in determining whether to vote to accept or reject the Plan. The Plan, if confirmed by the Bankruptcy Court, will affect your rights and the Debtors' obligations.

The Bankruptcy Court has approved this Disclosure Statement as containing adequate information under the particular circumstances. Approval of the Disclosure Statement does not constitute an endorsement or recommendation of the Plan by the Bankruptcy Court. The information contained in this Disclosure Statement was provided primarily by the Debtors and their advisors based on their first-hand knowledge of the Debtors' affairs and information provided to them by the Debtors and other parties in interest. Although the Debtors have done their best to ensure that this Disclosure Statement is correct and complete, it is impossible to represent that the information contained in this Disclosure Statement is without error.

**WHETHER OR NOT YOU VOTE ON THE PLAN, YOU WILL BE BOUND BY ITS TERMS IF THE BANKRUPTCY COURT CONFIRMS THE PLAN.** Allowance or disallowance of any Claim or Interest for voting purposes does not necessarily mean that all or a portion of a Claim or Interest will be allowed or disallowed for purposes of distribution under the Plan.

Votes on the Plan may not be solicited unless a copy of this Disclosure Statement is furnished prior to or concurrently with such solicitation. NO REPRESENTATIONS CONCERNING THE DEBTORS, PARTICULARLY AS TO THE VALUE OF THEIR ASSETS OR THE AMOUNT OF ANY DISTRIBUTIONS MADE UNDER THE PLAN, OTHER THAN THOSE SET FORTH IN THIS DISCLOSURE STATEMENT, ARE AUTHORIZED. ANY REPRESENTATION OR INDUCEMENT MADE TO SECURE ACCEPTANCE OR REJECTION OF THE PLAN THAT IS NOT CONTAINED IN THIS DISCLOSURE STATEMENT IS NOT AUTHORIZED, AND SHOULD NOT BE RELIED

UPON IN ARRIVING AT A VOTING DECISION. ANY SUCH ADDITIONAL REPRESENTATIONS OR INDUCEMENTS SHOULD BE REPORTED TO THE ATTORNEYS FOR THE DEBTORS, WHO MAY DELIVER SUCH INFORMATION TO THE BANKRUPTCY COURT FOR SUCH ACTION AS MAY BE APPROPRIATE.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN, AND NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN ADMISSION IN ANY PROCEEDING OR ACTION, OR BE DEEMED TO BE ADVICE ON THE TAX OR LEGAL EFFECT OF THE PLAN ON ANY HOLDER OF A CLAIM OR INTEREST.

THIS DISCLOSURE STATEMENT WAS COMPILED FROM INFORMATION AVAILABLE TO THE DEBTORS AND THEIR ADVISORS. HOWEVER, A CERTIFIED AUDIT OF THE DEBTORS HAS NOT BEEN PERFORMED. THIS DISCLOSURE STATEMENT ALSO CONTAINS A SUMMARY OF CERTAIN PROVISIONS OF THE PLAN. WHILE THE DEBTORS BELIEVE THAT THE SUMMARY IS FAIR AND ACCURATE, SUCH SUMMARY IS QUALIFIED TO THE EXTENT THAT IT DOES NOT SET FORTH THE ENTIRE TEXT OF THE PLAN. REFERENCE IS MADE TO THE PLAN FOR A COMPLETE STATEMENT OF THE TERMS AND PROVISIONS THEREOF. IF ANY INCONSISTENCIES EXIST BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE PLAN SHALL CONTROL.

THE STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF, UNLESS ANOTHER TIME IS SPECIFIED IN THIS DISCLOSURE STATEMENT. THE DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT, UNDER ANY CIRCUMSTANCES, CREATE AN IMPLICATION THAT

THERE HAS BEEN NO CHANGE IN ANY FACTS SET FORTH IN THIS DISCLOSURE STATEMENT SINCE THE DATE HEREOF.

THIS DISCLOSURE STATEMENT IS INTENDED FOR THE SOLE USE OF CREDITORS, WHOSE INTERESTS IN THE DEBTORS' ESTATES ARE IMPAIRED UNDER THE PLAN, TO ENABLE SUCH CREDITORS TO MAKE AN INFORMED DECISION IN VOTING ON THE PLAN. THIS DISCLOSURE STATEMENT MAY NOT BE USED OR RELIED ON FOR ANY OTHER PURPOSE, AND NOTHING CONTAINED IN IT SHALL BE DEEMED CONCLUSIVE ADVICE ON THE LEGAL OR OTHER EFFECTS OF THE PLAN ON HOLDERS OF CLAIMS OR INTERESTS.

AMENDMENTS TO THE PLAN THAT DO NOT MATERIALLY AND ADVERSELY CHANGE THE TREATMENT OF ANY CLASS MAY BE MADE TO THE PLAN PRIOR TO CONFIRMATION WITHOUT FURTHER SOLICITATION. SUCH AMENDMENTS MAY BE APPROVED BY THE BANKRUPTCY COURT AT THE CONFIRMATION HEARING WITHOUT ENTITLING MEMBERS OF ANY CLASSES WHOSE TREATMENT IS NOT ADVERSELY CHANGED TO WITHDRAW ANY VOTES TO ACCEPT OR REJECT THE PLAN.

THIS DISCLOSURE STATEMENT SUMMARIZES THE PLAN. FOR A DEFINITIVE UNDERSTANDING OF THE TERMS OF THE PLAN, THE DEBTORS RECOMMEND THAT YOU REVIEW THE PLAN ITSELF AND CONSULT YOUR ATTORNEY AND/OR TAX PROFESSIONAL.

## ARTICLE I
## BACKGROUND

### A.    The Debtors' Businesses

(1)    Overview.

Prior to the Petition Date and the sale of substantially all of their assets, the Debtors comprised a leading business-to-business media enterprise providing factual, "need-to-have," timely information to their customers and subscribers that simplified and explained complex regulations. The Debtors enjoyed a strong reputation for supplying trustworthy and high-value information to professionals in the fields of healthcare, financial services, human resources policy, pensions and benefits, grants and education, food and drug, law, environmental, and energy. With their broad portfolio of market-leading services, the Debtors provided value to their customers by recommending strategies for compliance and interpreting industry-specific trends.

The Debtors offered over 300 products and services consisting of specialty newsletters, loose-leaf services, book series, web subscriptions and email advisory alerts. The Debtors relied exclusively upon third-party authors, each an expert in his or her field, to supply the content for their publications. The Debtors' services were offered in a wide variety of print and electronic formats to over 70,000 subscribers, which included financial institutions, law firms, corporations, accounting firms, hospitals, and medical-related companies. In addition, the Debtors provided executive-level conferences, interactive training programs and in-house training services for private- and public-sector employees. Approximately 74% of the Debtors' revenue was generated by subscription fees from products, which realized a renewal rate of approximately 72% on average.

The Debtors include TPH Seller, Inc., a Delaware corporation formerly known as Thompson Publishing Holding Co. Inc. ("Parent"), AHC Seller LLC, a Delaware limited liability company formerly known as AHC Media LLC ("AHC"), AES Seller, Inc., a Delaware corporation formerly known as Alex eSolutions, Inc. ("AES"), TPG Seller, Inc., a Delaware corporation formerly known as Thompson Publishing Group, Inc. ("TPG"), PI Seller, Inc., a Virginia corporation formerly known as The Performance Institute, Inc. ("TPI"), TPG AES Holding Seller, Inc., a Delaware corporation formerly known as TPG AES Holding Co., Inc. ("TAH"), and TPD Seller, LLC, a Delaware limited liability company formerly known as Thompson Publishing Development, LLC ("TPD"). TAH is a wholly-owned subsidiary of the Parent. Each of TPG, AHC, AES, and TPI are wholly-owned subsidiaries of TAH. TPD is a wholly-owned subsidiary of TPG.

(2)     The Debtors' Business Divisions

The Debtors were organized into distinct business divisions.     TPG, which was headquartered in Washington, D.C., published subscription-based regulatory and compliance information, primarily for human resource and education professionals. TPG published more than 50 products, with a renewal subscriber base of approximately 30,000 subscribers. Its customers included small and medium businesses, law firms, government, academic institutions and financial institutions.

AES was headquartered in Austin, Texas. AES specialized in publishing critical, need-to-know information for regulatory, compliance issues and legal analysis for the financial services industry. AES published under the Sheshunoff®, A.S. Pratt®, and Alex Information® brands. AES's end customers included small and mid-sized banks, credit unions, law firms and libraries. In all, AES published more than 140 titles and had a renewable subscriber base of approximately 19,000 subscribers.

AHC was headquartered in Atlanta, Georgia. AHC published subscription-based healthcare products, with a focus on clinical medicine, health care management, biotechnology, and medical technology. AHC was also a leading provider of accredited continuing education for physicians, nurses and pharmacists. AHC's customers relied on such information to stay current on up-to-date industry practices.

AHC's business was organized as two operating segments: the healthcare group, with 40 publications covering clinical information and professional education, and the bio group, with approximately 12 print and online newsletters. AHC's end customers included medical institutions, physicians and professionals within biotech, medical-tech, and pharmaceutical industries as well as the businesses that serve each of the foregoing. In total, AHC published more than 50 product titles, and had a renewable subscriber base of 24,000 subscribers.

TPI was headquartered in Washington, D.C. TPI was an independent provider of executive-level conferences, interactive training programs, strategic consulting and in-house training services. It specialized in performance measurement and management, process improvement, project management, human capital and financial management.

TPI's business operated two divisions: Performance Institute, which focused on the disciplines related to performance improvement and management within the government market at the federal, state and local levels, and The American Strategic Management Institute, which focused on the disciplines related to performance improvement, process improvement and financial management within the private sector. In the aggregate, TPI held more than 70 conferences and open-enrollment training courses each year, attracting approximately 2,000 executives.

Although the Debtors were organized into separate business divisions, their back office operations were thoroughly integrated. By consolidating their support functions, the Debtors

11

were able to reduce their costs, both in terms of personnel and overhead. For example, all billing and collection functions were performed at the Debtors' operations center located in Tampa, Florida, and all of the Debtors' warehousing and distribution were done in Austin, Texas. In addition, the Debtors centralized all of the Debtors' executive and financial management functions.

### B. The Debtors' Prepetition Financing

On or about July 6, 2007, TAH entered into the Amended and Restated Credit Agreement (the "First Lien Credit Agreement") with PNC Bank, N.A., as successor to National City Bank, as Administrative Agent (in such capacity, the "First Lien Administrative Agent") and the other lenders party thereto (collectively, with the First Lien Administrative Agent, the "First Lien Lenders"). Pursuant to the First Lien Credit Agreement, and subject to the terms and conditions set forth therein, the First Lien Lenders agreed to make certain loans to TAH, including (a) a $15,000,000 revolving credit facility, and (b) a $100,000,000 term loan. Also on July 6, 2007, TAH and the First Lien Administrative Agent entered into the Second Amended and Restated Security Agreement (the "First Lien Security Agreement"), pursuant to which TAH granted to the First Lien Administrative Agent, for the benefit of the First Lien Lenders and as security for TAH's obligations to the First Lien Lenders (the "First Lien Obligations"), a first-priority security interest in all of TAH's assets. As of the Petition Date, the Debtors believe that the aggregate amount of the First Lien Obligations (including all amounts owed under the ISDA Agreement, as such term is defined below) was approximately $122,618,531.00.

The First Lien Obligations were guaranteed by each of the Parent, TPG, AES, AHC and TPI and were secured by a first-priority lien on all of the assets of TPG, AES, AHC and TPI. In addition, the stock or equity interests in each of TAH, AES, AHC, TPG, and TPI were pledged to the First Lien Administrative Agent as security for the First Lien Obligations.

TAH and PNC Bank, N.A., as successor to National City Bank, in its capacity as the "swap provider" (the "Swap Party"), were also party to that certain ISDA Master Agreement, dated as of September 12, 2007 (the "ISDA Agreement"). Pursuant to the ISDA Agreement, TAH was indebted to the Swap Party on account of certain contingent interest rate hedging agreements. TAH's obligations under the ISDA Agreement were secured by the liens and security interests granted to the First Lien Administrative Agent. On June 15, 2010, the First Lien Administrative Agent terminated the ISDA Agreement.

On or about July 17, 2007, TAH entered into the Amended and Restated Second Lien Credit Agreement (the "Second Lien Credit Agreement") with Ableco Finance LLC (as successor to National City Bank), as Administrative Agent (in such capacity, the "Second Lien Administrative Agent") and the other lenders party thereto (collectively, with the Second Lien Administrative Agent, the "Second Lien Lenders"). Pursuant to the Second Lien Credit Agreement, and subject to the terms and conditions set forth therein, the Second Lien Lenders agreed to make a $40,000,000 term loan to TAH. Also on July 6, 2007, TAH and the Second Lien Administrative Agent entered into the Second Amended and Restated Security Agreement (the "Second Lien Security Agreement"), pursuant to which TAH granted to the Second Lien Administrative Agent, for the benefit of the Second Lien Lenders and as security for TAH's obligations to the Second Lien Lenders (the "Second Lien Obligations"), a second-priority security interest in all of TAH's assets. As of the Petition Date, the Debtors believe that the aggregate amount of the Second Lien Obligations was approximately $43,500,000.

The Second Lien Obligations were guaranteed by each of the Parent, TPG, AES, AHC and TPI and were secured by a second-priority lien on all of the assets of TPG, AES, AHC and TPI. In addition, the stock or equity interests in each of TAH, AHC, TPG, AES and TPI were

13

pledged to the Second Lien Administrative Agent as security for the Second Lien Obligations (subject to the pledge of such shares to the First Lien Administrative Agent).

On or about July 17, 2007, the First Lien Administrative Agent and the Second Lien Administrative Agent entered into that certain Amended and Restated Intercreditor Agreement (the "Intercreditor Agreement"), pursuant to which, among other things, the parties agreed that the liens and security interests granted by the Debtors to the Second Lien Administrative Agent were subordinated to those granted to the First Lien Administrative Agent.

### C. Events Leading to Chapter 11 Cases

Over the past several years, and in the midst of a global economic downturn that has proved particularly difficult for the publishing industry, the Debtors experienced a significant decline in revenue and profitability. In addition to the generally poor economic conditions faced by all businesses in recent years, the Debtors faced certain other unique challenges to their businesses, including (a) the near-implosion of the financial services industry, the source of many of the Debtors' customers and subscribers, (b) a relative lack of new regulations in recent years, leading to a decreased interest in certain of the Debtors' publications, (c) the rapid proliferation of free online content that addresses certain of the topics covered by the Debtors' publications, and (d) a significant decrease in the conference business.

In response to these challenges, the Debtors' management aggressively cut costs, eliminating numerous unprofitable or low volume products and publications. As a result of these and other actions, the Debtors' management was able to reduce the Debtors' costs by approximately $9 million between 2009 and 2010. However, in light of the Debtors' recent performance and the continued deterioration of the Debtors' cash flow, the Debtors' capital structure remained unsustainable.

14

As a result of economic conditions and the challenges faced by the Debtors, they defaulted on their obligations under the First Lien Credit Agreement due to (a) their failure to comply with certain financial covenants set forth therein for the fiscal quarters ending on and after October 31, 2009, and (b) their failure to make certain payments due thereunder and under the ISDA Agreement. In addition, the Debtors defaulted on their obligations under the Second Lien Credit Agreement due to (a) their failure to comply with certain financial covenants set forth therein for the fiscal quarters ending on and after October 31, 2009, and (b) their failure to make certain interest payments due thereunder.

Subsequently, the Debtors engaged in extensive discussions with the First Lien Lenders and the Second Lien Lenders concerning the possible restructuring of the Debtors' secured debt obligations. However, the Debtors, the First Lien Lenders and the Second Lien Lenders were unable to reach an agreement on the restructuring of their debt obligations acceptable to all parties.

On February 9, 2010, pursuant to a written notice (the "Acceleration Notice"), the Second Lien Lenders accelerated the Second Lien Obligations. The Intercreditor Agreement prohibited the Second Lien Lenders from taking any further action to enforce their rights and remedies until the passage of a standstill period of at least 120 days, which could last indefinitely so long as the First Lien Lenders had commenced and diligently pursued the exercise of their rights and remedies with respect to the Debtors' assets.

On March 1, 2010, the Debtors retained Loughlin Meghji + Company Associates, Inc. ("LM") to advise them in connection with their restructuring efforts. LM is a nationally-recognized consulting firm which advises debtors, creditors and investors on complex operational and financial restructuring matters. On June 16, 2010, LM and the Debtors entered into a letter agreement establishing the terms of LM's engagement. Pursuant to that letter

15

agreement, James J. Loughlin, Jr. was appointed to serve as the Vice President and Chief Restructuring Officer of each of the Parent, TAH, TPG, AHC, AES and TPI and each of Kevin Shea and Adam Levy of LM were appointed to serve as a Vice President and Assistant Restructuring Officer of each of the Parent, TAH, TPG, AHC, AES and TPI.

Given the Debtors' need to reduce their debt load and interest expense, their increasing concerns about the potential deterioration of their business and concomitant degradation in value, and their inability to reach an agreement with their secured creditors on a consensual, out-of-court restructuring of their debt, the Debtors ultimately determined that they could maximize their value through the sale of their operations. Accordingly, on June 16, 2010, the Debtors retained SSG Capital Advisors, LLC ("SSG") to provide investment banking services to the Debtors and to commence a sale process with respect to the Debtors' business.

On July 1, 2010, the Debtors and the First Lien Administrative Agent, on behalf of the First Lien Lenders, entered into the Enforcement of Rights and Remedies Agreement (the "Enforcement Agreement"), pursuant to which the Debtors and the First Lien Lenders agreed to certain specific actions to be undertaken in connection with the exercise of rights and remedies by the First Lien Administrative Agent. In particular, pursuant to the Enforcement Agreement, the Debtors and the First Lien Administrative Agent agreed, in relevant part, that:

- the Debtors would continue to retain LM pursuant to the terms and conditions of the June 16 letter agreement;

- the Debtors would continue to retain SSG pursuant to the terms and conditions of the June 16 letter agreement;

- the Debtors and SSG would commence a sale process with respect to the Debtors' business, culminating in the receipt of letters of intent from potential bidders by August 6, 2010 (which date was later extended, by mutual agreement of the Debtors, SSG and the First Lien Administrative Agent, to August 13, 2010); and

- absent the occurrence of certain events, including an event of default under the Enforcement Agreement or an event of default (other than existing defaults

16

specified in the Enforcement Agreement) under the First Lien Loan Agreement, the First Lien Administrative Agent would not take any additional action to exercise its rights or remedies against the Debtors until October 1, 2010.

**D.    The Sale Process**

Following its retention by the Debtors, SSG aggressively began to market the Debtors' business, both as a stand-alone business and as separate business units. SSG contacted 152 potential buyers, including strategic buyers, financial buyers with interest and/or experience in the publishing industry, and financial buyers with interest in distressed assets. Of the 152 potential buyers contacted, 64 negotiated and signed confidentiality agreements with the Debtors. Those parties received a Confidential Information Memorandum (a "CIM") concerning the Debtors, as well as a letter that outlined the information that should be addressed in any indication of interest (an "IOI"), including valuation, structure, financial wherewithal, and bid timing. Interested bidders were instructed to submit an IOI on or before August 6, 2010 (which date was later extended to August 13, 2010).

Of the 64 parties that received a CIM, 23 requested and received access to an on-line "data room" established by SSG. The data room included information concerning the Debtors' operations, finances and obligations. SSG encouraged all parties who received access to the data room to conduct extensive initial due diligence. In addition, certain of those parties requested and received access to the Debtors' senior management to discuss the Debtors' businesses.

By mid-August, SSG had received seven (7) IOIs with respect to the Debtors, including five (5) bids to purchase the Debtors in their entirety, and two (2) bids to purchase certain of the Debtors' operating divisions. Generally, the values reflected in the IOIs were lower than what the Debtors and the First Lien Lenders believed constituted fair value for the Debtors' business. In addition, many of the parties submitting IOIs had performed limited due diligence, and

17

indicated that they would require 45 – 60 days to complete due diligence before they would be in a position to sign a binding asset purchase agreement.

After reviewing the IOIs, the First Lien Lenders decided to submit a "credit bid" for the Debtors' business, which bid is described in greater detail below (the "Credit Bid"). In light of several factors, including, without limitation, the First Lien Administrative Agent's first priority security interest on the Debtors' assets and the ability of the First Lien Lenders to negotiate a binding asset purchase agreement and consummate a sale on a relatively short timetable, the Debtors determined that the Credit Bid presented a viable opportunity and commenced the Chapter 11 Cases to implement the proposed transaction with the First Lien Lenders pursuant to Section 363 of the Bankruptcy Code, subject to a competitive sale process and the solicitation of higher and/or otherwise better offers (a "Sale").

## ARTICLE II
## THE INSTANT CASES

### A.    The Petition Date

On September 21, 2010 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. Since the Petition Date and until the closing of the sale of the Debtors' assets described herein, the Debtors continued in possession of their property and in control of their operations as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. No trustee, examiner or creditors' committee has been appointed in these Chapter 11 Cases.

### B.    Schedules of Assets and Liabilities; Statements of Financial Affairs; Monthly Operating Reports; Meeting of Creditors

On October 21, 2010, the Debtors filed the requisite schedules of assets and liabilities and statements of financial affairs required pursuant to Section 521 of the Bankruptcy Code and Bankruptcy Rule 1007. In addition, throughout the Chapter 11 Cases the Debtors filed the

monthly operating reports required pursuant to Section 1106 of the Bankruptcy Code, Bankruptcy Rule 2015(a) and the guidelines of the Office of the United States Trustee. The Debtors (or the Liquidating Supervisor, as applicable) anticipate paying in full all United Status Trustee fees as those fees come due in the ordinary course. The meeting of creditors required pursuant to Section 341(a) of the Bankruptcy Code was held on October 29, 2010.

###    C.    Significant "First Day" Motions

To minimize the adverse effects on the Debtors' businesses as a result of the commencement of their Chapter 11 Cases, the Debtors, immediately after filing their bankruptcy petitions, filed a variety of "first day" applications and motions by which they sought and obtained various forms of relief designed to meet the immediate goals of: (a) establishing procedures for the efficient administration of their Chapter 11 Cases; (b) continuing the Debtors' operations during the Chapter 11 Cases with as little disruption and loss of productivity as possible; (c) maintaining the confidence and support of the Debtors' vendors, authors, customers, employees and other key constituencies; (d) obtaining debtor-in-possession financing; (e) obtaining authority to use cash collateral; and (f) retaining appropriate professionals. Certain of such "first day" motions and applications are summarized briefly below:

(1)    Motion for Joint Administration. On the Petition Date, the Debtors filed a motion seeking an order directing the joint administration of their Chapter 11 Cases under a single lead case number. The Bankruptcy Court granted this motion by an order entered on September 23, 2010 [Docket No. 22].

(2)    Motion to Continue Customer Programs. On the Petition Date, the Debtors filed a motion seeking an order authorizing, but not directing, the Debtors to honor prepetition obligations to customers and continue customer programs and practices in the ordinary course of business, and authorizing and directing financial institutions to receive, process, honor and pay

all electronic payment requests and checks presented for payment relating thereto. The Bankruptcy Court granted this motion by an order entered on September 23, 2010 [Docket No. 23].

(3)     Motion for Authority to Honor Prepetition Obligations to Authors. On the Petition Date, the Debtors filed a motion seeking an order (a) authorizing, but not directing, the Debtors, in their business judgment and sole discretion, to honor certain undisputed prepetition obligations and to continue during the post-petition period their prepetition practices with certain individuals and organizations who provided the content for the Debtors' publications or other products, and (b) authorizing all banks and other financial institutions to receive, process, honor and pay any and all checks presented for payment and electronic transfers with respect to payments authorized by such motion. The Bankruptcy Court granted this motion by an order entered on September 23, 2010 [Docket No. 24].

(4)     Motion for Authority to Honor Prepetition Obligations to the Printer and Telemarketing Firms. On the Petition Date, the Debtors filed a motion seeking an order (a) authorizing, but not directing, the Debtors, in their business judgment and sole discretion, to honor certain undisputed prepetition obligations and to continue during the post-petition period their prepetition practices with certain parties who print the Debtors' publications and provide direct marketing services to the Debtors for promotion of their publications, and (b) authorizing all banks and other financial institutions to receive, process, honor and pay any and all checks presented for payment and electronic transfers with respect to payments authorized by such motion. The Bankruptcy Court granted this motion by an order entered on September 23, 2010 [Docket No. 25].

(5)     Motion for Authority to Continue Insurance Policies and Honor Obligations in Respect Thereto. On the Petition Date, the Debtors filed a motion seeking an order authorizing

the Debtors to (a) maintain and continue to make all post-petition payments (including post-petition fees and premiums) with respect to various insurance policies on an uninterrupted basis; (b) maintain and continue on an uninterrupted basis the Debtors' prepetition practices with respect to such insurance policies and related contracts; (c) pay any prepetition premiums related to such insurance policies to the extent that the Debtors determined, in their discretion, that such payment was necessary to avoid cancellation, default, alteration, assignment, attachment, lapse or any form of impairment to the coverage, benefits or proceeds provided under such insurance policies; and (d) enter into new policies or renew existing policies in the ordinary course of business. The Bankruptcy Court granted this motion by an order entered on September 23, 2010 [Docket No. 26].

(6)     Motion to Prohibit Utilities from Discontinuing Service, Deem Utilities Adequately Assured of Future Performance and Establish Related Procedures. On the Petition Date, the Debtors filed a motion seeking an order (a) prohibiting the Debtors' utility providers from altering, refusing, or discontinuing service; (b) determining that such utility providers had been provided with adequate assurance of payment on the basis of the establishment of a utility deposit account; and (c) approving the Debtors' proposed procedures for such utility providers to request additional assurance of payment. The Bankruptcy Court granted this motion on an interim basis by an order entered on September 23, 2010 [Docket No. 27], and on a final basis by an order entered on October 12, 2010 [Docket No. 89].

(7)     Motion for Authority to Pay Certain Prepetition Employee and Withholding Obligations. On the Petition Date, the Debtors filed a motion seeking an order authorizing, but not directing, the Debtors to: (a) pay all prepetition and post-petition wages, salaries, and other accrued compensation to their employees; (b) reimburse all prepetition and post-petition employee business expenses; (c) make all payments for which prepetition payroll deductions,

21

withholdings, or matching employer contributions were made; (d) make all contributions to prepetition employee benefit programs and continue such programs in the ordinary course of business; (e) honor workers' compensation program obligations; and (f) pay all processing costs and administrative expenses relating to the foregoing payments and contributions, including any payments to third party administrators or other administrative service providers. The Bankruptcy Court granted this motion by an order entered on September 23, 2010 [Docket No. 28].

(8)     Motion for Authority to Pay Certain Prepetition Taxes. On the Petition Date, the Debtors filed a motion seeking an order (a) authorizing, but not directing, the Debtors to pay all prepetition sales, use, franchise, and personal property taxes, as well as all other taxes for which there may have been personal liability for officers and directors, and (b) authorizing and directing banks and other financial institutions to receive, process, honor and pay all checks presented for payment and electronic payment requests related to the foregoing. The Bankruptcy Court granted this motion by an order entered on September 23, 2010 [Docket No. 29].

(9)     Motion to Maintain Bank Accounts and Cash Management System. On the Petition Date, the Debtors filed a motion seeking an order authorizing, but not directing, the (a) continued use of the Debtors' centralized cash management system and procedures; (b) maintenance of existing bank accounts and continued use of existing business forms; (c) waiver of certain operating guidelines relating to bank accounts; and (d) limited waiver of the Section 345(b) of the Bankruptcy Code deposit and investment guidelines. The Bankruptcy Court granted this motion by an order entered on September 24, 2010 [Docket No. 37].

## D.     Post-Petition Financing

In order to operate during their Chapter 11 Cases and thereby have an opportunity to complete the orderly sale of their assets, the Debtors required immediate additional financing. Prior to the Petition Date, the Debtors contacted seven (7) lending institutions in search of post-

petition financing. These institutions indicated that they were unwilling to provide the Debtors with any type of post-petition financing, primarily because of the existing liens on the Debtors' assets, the relatively small size of the facility requested by the Debtors, the lack of tangible assets available to secure financing, and the Debtors' financial condition. In addition, the First Lien Administrative Agent and the First Lien Lenders indicated that they would object vigorously to any post-petition financing provided by an entity other than certain First Lien Lenders.

As a result, after substantial negotiations (a) the First Lien Administrative Agent and the First Lien Lenders agreed to the Debtors' use of their cash collateral and (b) PNC Bank, National Association, General Electric Capital Corporation and NewStar Loan Funding LLC (collectively, the "DIP Lenders"), each of whom was also a First Lien Lender, agreed to provide post-petition secured financing (the "DIP Facility") to the Debtors. The DIP Facility consisted of a commitment in the maximum amount of up to $3,000,000, in accordance with the terms and conditions set forth in the definitive loan documents (the "DIP Documents"). The liens and security interests granted to the DIP Lenders to secure the DIP Facility constituted priming, first priority liens upon and security interests in (subject to a carve-out for certain professional and statutory fees) all or substantially all of the Debtors' assets.

In light of the foregoing, on the Petition Date and as part of the "first day" motions, the Debtors filed a motion seeking authority, among other things, to (a) obtain the DIP Facility on a superpriority basis pursuant to the terms and conditions set forth in the DIP Documents, (b) grant PNC Bank, National Association, as agent for the DIP Lenders (in such capacity, the "DIP Agent"), and the DIP Lenders allowed superpriority administrative expense claim status in each of the Chapter 11 Cases, (c) use the cash collateral of the First Lien Administrative Agent and the First Lien Lenders and provide adequate protection thereto, and (d) grant certain related relief to the DIP Agent, the DIP Lenders, the First Lien Administrative Agent and the First Lien

23

Lenders. The Bankruptcy Court granted this motion on an interim basis by an order entered on September 24, 2010 [Docket No. 35], and on a final basis by an order entered on October 12, 2010 [Docket No. 90].

## E. The Sale Motion

As set forth above, after extensive negotiations with the First Lien Lenders, a review of various liquidation and sale recovery scenarios and the IOIs received from interested bidders, and discussions with the Debtors' professionals, the Debtors determined that the Credit Bid by the First Lien Lenders presented a viable opportunity to maximize the value of the Debtors' estates for the benefit of their creditors. As a result, the Debtors commenced the Chapter 11 Cases to implement the proposed transaction with the First Lien Lenders pursuant to Section 363 of the Bankruptcy Code, subject to a competitive sale process and the solicitation of higher and/or otherwise better offers, and complete the prompt and orderly liquidation of substantially all of their assets.

In furtherance of this objective, the Debtors negotiated extensively with the First Lien Lenders on the terms and conditions of the Asset Purchase Agreement (the "Asset Purchase Agreement"), which was executed immediately prior to the Petition Date. The Asset Purchase Agreement contemplated the sale of substantially all of the Debtors' assets (as more specifically identified in the Asset Purchase Agreement, the "Purchased Assets") to the First Lien Lenders, free and clear of all liens, claims, encumbrances and other interests other than those expressly assumed by the First Lien Lenders. Any such non-assumed liens, claims, encumbrances and other interests against or in the Purchased Assets would attach to the net proceeds of a sale.

Pursuant to the Asset Purchase Agreement, the First Lien Administrative Agent or its permitted successors and assigns (the "Purchaser") agreed to purchase the Purchased Assets in exchange for the following consideration: (a) a credit bid in the amount of $42,000,000, (b) cash

24

in an amount sufficient for (i) the repayment of all outstanding obligations under the DIP Facility, (ii) the payment of all cure costs, and (iii) without duplication, the payment of the carve-out for professional and statutory fees and any additional amounts payable pursuant to and in accordance with the Wind-Down Budget, and (c) the assumption of certain of the Debtors' liabilities, including performance and post-closing payment obligations to their authors and subscribers.

On the Petition Date, the Debtors filed a motion seeking the Bankruptcy Court's approval of, among other things: (a) the assumption of the Asset Purchase Agreement and the sale of the Purchased Assets pursuant thereto, free and clear of all liens, claims, encumbrances and other interests, or the right to consummate a higher or otherwise better offer or transaction with an alternative buyer; (b) the institution of certain bidding, auction and notice procedures for the solicitation and consideration of competing offers for the Purchased Assets (collectively, the "Bidding Procedures"); and (c) the assumption, assignment and/or transfer of certain executory contracts and unexpired leases to the First Lien Lenders or, alternatively, to such other bidder that submitted a higher and better offer for the Purchased Assets.

On October 13, 2010, the Bankruptcy Court entered an order approving the Bidding Procedures (the "Bid Procedures Order") [Docket No. 97]. Among other things, the Bid Procedures Order established November 12, 2010, at 4:30 p.m. (the "Bid Deadline") as the deadline for interested parties to submit competing bids to acquire the Purchased Assets and November 17, 2010, at 10:00 a.m. as the date and time of the auction. The Bid Procedures Order also established November 12, 2010, at 4:30 p.m. as the deadline for interested parties to file any objections to the sale and scheduled the hearing to approve the sale for November 19, 2010, at 9:30 a.m.

Notwithstanding the efforts by the Debtors and their professionals to obtain competing bids, no interested party submitted a qualifying bid by the Bid Deadline. Therefore, on November 15, 2010, the Debtors filed a Notice of Cancelled Auction [Docket No. 168], cancelling the auction scheduled for November 17th and declaring that the Debtors intended to go forward with the sale hearing scheduled for November 19th and seek the Bankruptcy Court's approval of the sale of the Purchased Assets to the Purchaser.

On November 19, 2010, the Bankruptcy Court conducted the sale hearing and entered that certain *Order: (A) Approving Asset Purchase Agreement and Authorizing the Sale of Assets of Debtors Outside the Ordinary Course of Business; (B) Authorizing and Approving the Sale of Assets Free and Clear of Liens, Claims, Encumbrances, and Interests; (C) Approving the Assumption and Assignment of Designated Executory Contracts and Unexpired Leases; and (D) Granting Related Relief* [Docket No. 178] (the "Sale Order"), thereby authorizing the sale of the Purchased Assets to the Purchaser pursuant to the Asset Purchase Agreement. The Debtors and the Purchaser closed the sale on December 23, 2010.

### F. Change of Debtors' Names

In accordance with the Sale Order, the Debtors were required to change their names following the closing of the sale of substantially all of their assets. As a result, shortly following the closing of the sale the Debtors filed with the Delaware Division of Corporations and the Virginia State Corporation Commission, as applicable, certificates of amendment changing their names as follows:

| Old Name | New Name |
| --- | --- |
| Thompson Publishing Holding Co. Inc. | TPH Seller, Inc. |
| AHC Media LLC | AHC Seller LLC |
| Alex eSolutions, Inc. | AES Seller, Inc. |
| Thompson Publishing Group, Inc. | TPG Seller, Inc. |

| Old Name | New Name |
|---|---|
| The Performance Institute, Inc. | PI Seller, Inc. |
| TPG AES Holding Co., Inc. | TPG AES Holding Seller, Inc. |
| Thompson Publishing Development, LLC | TPD Seller, LLC |

The Debtors also filed a motion seeking the entry of an order authorizing the modification of the caption of the Debtors' jointly administered cases. On December 28, 2010, the Bankruptcy Court entered an order granting such motion [Docket No. 223].

### G.    Professionals Retained in These Cases

The Debtors have retained various professionals to assist them in their Chapter 11 Cases, including the following:[2]

| Professional | Role |
|---|---|
| James J. Loughlin, Jr. (Loughlin Meghji) | Chief Restructuring Officer |
| Kevin Shea (Loughlin Meghji) | Assistant Restructuring Officer |
| Adam Levy (Loughlin Meghji) | Assistant Restructuring Officer |
| SSG Capital Advisors, LLC | Investment Banker |
| Choate Hall & Stewart LLP | Co-Counsel |
| Morris, Nichols, Arsht & Tunnell LLP | Co-Counsel |
| WeiserMazars LLP | Accountant |
| Mark B. Baker | Special Counsel |
| Broyles, Rooks & Johnson | Auditor (401(k) Plans) |

---

[2] The Debtors retained Mark B. Baker and Broyles, Rooks & Johnson pursuant to that certain *Order Pursuant to 11 U.S.C. §§ 105(a) and 327 and Fed. R. Bankr. P. 2014 Authorizing the Debtors to Retain and Employ Professionals Used in the Ordinary Course of Business nunc pro tunc to the Petition Date*, entered by the Bankruptcy Court on October 12, 2010 [Docket No. 91]. The Debtors' retention of each other professional was approved by a separate order of the Bankruptcy Court.

In addition to the foregoing professionals, the Debtors retained Epiq Bankruptcy Solutions, LLC ("Epiq"), as claims, noticing and balloting agent in these Chapter 11 Cases.

## H.    Claims Bar Dates

On November 12, 2011, the Debtors filed a motion seeking entry of an order (a) establishing the general bar date by which certain creditors (including, without limitation, general unsecured creditors and creditors holding claims under Section 503(b)(9) of the Bankruptcy Code) and certain interest holders must file proofs of claim in these Chapter 11 Cases; (b) establishing the later of the General Bar Date and thirty (30) days after the effective date of the rejection of any executory contract or unexpired lease as the bar date by which a proof of claim relating to the Debtors' rejection of such contract or lease must be filed (the "Rejection Bar Date"); (c) establishing as the bar date by which creditors holding claims which have been amended by the Debtors in their schedules as the later of the General Bar Date and twenty (20) days after the date that notice of the amendment is served on the affected claimant (the "Amended Schedule Bar Date"); and (d) providing certain supplemental relief.

On November 29, 2010, the Bankruptcy Court granted the Debtors' motion and entered an order [Docket No. 186] (the "Bar Date Order") establishing January 18, 2011, at 4:00 p.m. as the date by which non-governmental holders of claims (including, without limitation, claims under Section 503(b)(9) of the Bankruptcy Code) and interests that arose prior to the Petition Date must file proofs of claim (the "General Bar Date"), and March 21, 2011, at 4:00 p.m. as the date by which government units holding claims and interests that arose prior to the Petition Date must file proofs of claim (the "Government Bar Date"). The Bar Date Order also established the Rejection Bar Date and the Amended Schedule Bar Date requested in the Debtors' motion.

On November 30, 2010, Epiq served notice of the General Bar Date, the Government Bar Date and the Rejection Bar Date upon the following parties: (a) the Office of the United States

Trustee; (b) all holders of claims against the Debtors that arose on or before the Petition Date (including claims for reclamation of goods delivered to the Debtors within forty-five (45) days prior to the Petition Date) and all holders of claims against the Debtors made by sellers of goods for the value of goods received by a Debtor in the ordinary course of business within 20 days of the Petition Date, in each case listed on the Debtors' schedules; (c) all counterparties to executory contracts and unexpired leases; (d) all current or former record holders of equity securities of a Debtor; (e) all current and former employees of the Debtors that left the employ of the Debtors on or after October 1, 2008; (f) all taxing authorities for locations in which the Debtors do business; (g) the Securities and Exchange Commission; (h) all lienholders; (i) all parties to litigation in which the Debtors are involved; (j) all providers of utility services to the Debtors; (k) all insurance providers to the Debtors; (l) all of the Debtors' ordinary course professionals; (m) the Debtors' banks; (n) the Debtors' pre- and post-petition secured lenders; (o) all entities requesting notice pursuant to Bankruptcy Rule 2002 as of the entry of the Bar Date Order; and (p) all parties that have filed proofs of claim in these Chapter 11 Cases as of the date of entry of the Bar Date Order. Further, on December 2, 2010, notice of the General Bar Date and the Government Bar Date was published in the national edition of the *Wall Street Journal*.

## ARTICLE III
## CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS

### A. In General

THE FOLLOWING DISCUSSION OF CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS IS FOR GENERAL INFORMATION PURPOSES ONLY, IS NOT TAX ADVICE, WAS WRITTEN TO SUPPORT THE DEBTORS' SOLICITATION OF VOTES TO ACCEPT THE PLAN, AND IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, FOR THE PURPOSE OF AVOIDING PENALTIES.

**ACCORDINGLY, EACH HOLDER OF A CLAIM OR INTEREST SHOULD CONSULT ITS TAX ADVISOR WITH RESPECT TO THE TAX CONSEQUENCES OF THE PLAN DESCRIBED HEREIN AND THE APPLICATION OF FEDERAL, STATE, LOCAL AND FOREIGN TAX LAWS. NEITHER THE DEBTORS NOR ANY OF THEIR PROFESSIONALS SHALL HAVE ANY LIABILITY TO ANY PERSON OR HOLDER OF A CLAIM OR INTEREST ARISING FROM OR RELATED TO THE U.S. FEDERAL, STATE, LOCAL OR FOREIGN TAX CONSEQUENCES OF THE PLAN OR THE FOLLOWING DISCUSSION.**

The following discussion summarizes certain material U.S. federal income tax consequences expected to result from the consummation of the Plan. This discussion is based on current provisions of the Internal Revenue Code of 1986, as amended (the "IRC"), applicable Treasury Regulations, judicial authority and current administrative rulings and pronouncements of the Internal Revenue Service (the "Service"). There can be no assurance that the Service will not take a view contrary to the tax consequences set forth below. No ruling from the Service has been or will be sought nor will any counsel provide a legal opinion as to the expected tax consequences of the Plan.

Legislative, judicial or administrative changes or interpretations may be forthcoming that could alter or modify the statements and conclusions set forth herein. Any such changes or interpretations may or may not be retroactive and could affect the tax consequences to the holders of Claims or Interests (for purposes of this discussion, holders of Claims and Interests collectively will be referred to as the "Holders" and each a "Holder") and the Debtors. It cannot be predicted at this time whether any tax legislation will be enacted or, if enacted, whether any tax law changes would affect the tax consequences described herein.

The following summary is for general information only. The tax treatment of a Holder may vary depending upon such Holder's particular situation. This summary does not address all of the tax consequences that may be relevant to a Holder, including any alternative minimum tax consequences, and does not address the tax consequences to a Holder that has made an agreement to resolve its Claim or Interest in a manner not explicitly provided for in the Plan. This summary also does not address the U.S. federal income tax consequences to persons not entitled to vote on the Plan or Holders subject to special treatment under the U.S. federal income tax laws, such as brokers or dealers in securities or currencies, certain securities traders, tax-exempt entities, financial institutions, insurance companies, foreign persons, Holders that hold Claims or Interests as a position in a "straddle" or as part of a "synthetic security," "hedging," "conversion" or other integrated instrument, Holders that have a "functional currency" other than the United States dollar and Holders that have acquired Claims or Interests in connection with the performance of services. The following summary assumes that the Claims or Interests are held by Holders as "capital assets" within the meaning of Section 1221 of the IRC and that all Claims denominated as indebtedness are properly treated as debt for U.S. federal income tax purposes.

## B.     U.S. Federal Income Tax Consequences to the Debtors

When a debt owed by a party is forgiven or discharged for an amount less than the adjusted issue price (which, in most cases, is the amount the party received on incurring the obligation, with certain adjustments), such discharge or forgiveness generally gives rise to cancellation of debt ("COD") income. When the party is in bankruptcy, however, it often is able to utilize a special tax provision which excludes from income debts discharged in a chapter 11 case (the "Bankruptcy Exception"). Under Section 108(b) of the IRC, a debtor need not recognize COD income as income, but is required to reduce certain of its tax attributes, such as

31

net operating loss carryforwards (and certain other losses, credits and carryforwards, if any), generally in an amount equal to the amount of such debtor's COD income excluded from income under the Bankruptcy Exception.

## C.     U.S. Federal Income Tax Consequences to Holders of Allowed and Disputed Claims

In general, Holders of Allowed Claims will recognize gain or loss on their Claims as set forth below. The character of any gain or loss as capital gain or loss or ordinary income or loss and, in the case of capital gain or loss, as short-term or long-term, will depend on a number of factors, including: (i) the nature and origin of the Claim; (ii) the tax status of the Holder of the Claim; (iii) whether the Claim has been held for more than one year; (iv) the extent to which the Holder previously claimed a loss or bad debt deduction with respect to the Claim; and (v) whether the Claim was acquired at a market discount. A Holder of a Claim that purchased its Claim from a prior Holder at a market discount may be subject to the market discount rules of the IRC. Under those rules, assuming that such Holder has made no election to amortize the market discount into income on a current basis, any gain recognized on the exchange of such Claim (subject to a *de minimis* rule) generally would be characterized as ordinary income to the extent of the accrued market discount on such Claim as of the date of the exchange. **Holders of Allowed Claims should note the tax treatment of Allowed Claims is uncertain and should consult their own tax advisors.**

### D.     U.S. Federal Income Tax Consequences to Holders of Interests

Under the Plan, Holders of Interests are not entitled to receive any distributions on account of such Interests. Accordingly, Holders of Interests who hold Interests as capital assets may be able to claim a loss from the worthlessness of the Interests. Such a loss would be treated as a loss from the sale or exchange of a capital asset on the last day of the taxable year in which

the Interests became worthless. **Holders of Interests should consult their own tax advisors as to the availability of such a loss and the taxable year in which such loss might be available.**

### E.    Backup Withholding and Information Reporting

A Holder may be subject to backup withholding with respect to any "reportable" payments received pursuant to the Plan unless such Holder (i) is a corporation or comes within certain other exempt categories and, when required, demonstrates this fact or (ii) provides a correct taxpayer identification number, certifies as to no loss of exemption from backup withholding and complies with applicable requirements of the backup withholding rules. A Holder who does not provide a correct taxpayer identification number may be subject to penalties imposed by the Service. Amounts withheld under the backup withholding rules may be credited against a Holder's tax liability, and a Holder may obtain a refund of any excess amounts withheld under the backup holding rules by timely filing the appropriate claim for refund with the Service.

### ARTICLE IV
### THE LIQUIDATING PLAN

### A.    Overview of the Plan

The Plan is a liquidating plan. As described above, the Debtors have liquidated substantially all of their assets through a going-concern sale of the Debtors' businesses pursuant to Section 363 of the Bankruptcy Code as further described herein. To liquidate the Debtors' remaining assets and, ultimately, to effectuate the distribution of such assets to Creditors, the Plan provides for the appointment of a Liquidating Supervisor on the Effective Date. After the Effective Date, the Liquidating Supervisor will review and, if appropriate, object to Claims and/or Interests against the Debtors and liquidate the Debtors' remaining assets, with the

proceeds of such assets and revenues to be distributed to Creditors as set forth in the Plan. On a subsequent date, to be determined by the Liquidating Supervisor, the Debtors will be dissolved.

The following table sets forth a brief summary of the classification, treatment and estimated recoveries of Claims and Interests under the Plan. The information set forth in such table is for convenience only and is qualified in its entirety by the contents of the Plan:

| Class | Treatment | Entitled to Vote? | Estimated Recovery |
|-------|-----------|-------------------|--------------------|
| Class 1 – Allowed Secured Claims | Class 1 consists of all Allowed Secured Claims against the Debtors. The Allowed Claims in Class 1 have been previously satisfied by the Debtors or were assumed by the Purchaser under, and are deemed paid in full pursuant to, the Asset Purchase Agreement and the Sale Order. Although holders of Allowed Claims in Class 1 will receive no property under the Plan, Class 1 is Unimpaired. | No | N/A |
| Class 2 – Allowed Priority Claims | Class 2 consists of all Allowed Priority Claims against the Debtors. The Allowed Claims in Class 2 have been assumed by the Purchaser under, and are deemed paid in full pursuant to, the Asset Purchase Agreement and the Sale Order. Although holders of Allowed Claims in Class 2 will receive no property under the Plan, Class 2 is Unimpaired. | No | N/A |
| Class 3 – General Unsecured Claims | Class 3 Consists of all Allowed General Unsecured Claims against the Debtors. Each holder of an Allowed Claim in Class 3 shall be entitled to receive, subject to the terms of the Plan and in full satisfaction, settlement, release and discharge of, and in exchange for such Allowed Claim, its *Pro Rata* Share of the Net Creditor Payment Fund; provided, that no Distribution shall be made to holders of General Unsecured Claims in Class 3 unless and until all Allowed Administrative Expenses and all Professional Fee Claims have been paid in full, reserved or otherwise resolved, and/or included in or accounted for in the Distribution at issue. Class 3 is Impaired. | Yes | 20% |

| Class | Treatment | Entitled to Vote? | Estimated Recovery |
|-------|-----------|-------------------|--------------------|
| Class 4 – Allowed Deficiency Claims of First Lien Secured Parties | Class 4 consists of all Allowed Deficiency Claims of the First Lien Secured Parties against the Debtors. Each holder of an Allowed Claim in Class 4 shall be entitled to receive, subject to the terms of the Plan and in full satisfaction, settlement, release and discharge of, and in exchange for such Allowed Claim, its *Pro Rata* Share of Available Cash; provided, that (a) no Distribution shall be made to holders of Allowed Deficiency Claims in Class 4 unless and until all Allowed Administrative Expenses and all Professional Fee Claims have been paid in full, reserved or otherwise resolved, and/or included in or accounted for in the Distribution at issue; and (b) notwithstanding anything to the contrary set forth in the Plan, holders of Class 4 Allowed Deficiency Claims shall not be entitled to receive any Distribution from the Creditor Payment Fund. Class 4 is Impaired. | Yes | 0% |
| Class 5 – Allowed Deficiency Claims of Second Lien Claimholders | Class 5 consists of all Allowed Deficiency Claims of the Second Lien Claimholders against the Debtors. Holders of Allowed Claims in Class 5 shall not be entitled to receive any distribution on account of such Claims. Class 5 is Impaired. | No | 0% |
| Class 6 – Interests | Class 6 consists of all Interests in the Debtors. Holders of Interests in Class 6 shall not be entitled to receive any distribution on account of such Interests. Class 6 is Impaired. | No | 0% |

The Debtors currently have on hand approximately $1,150,000 in cash (as set forth in the Debtors' February 2011 Monthly Operating Report), of which (a) $100,000 has been set aside in the Creditor Payment Fund for distribution to holders of Class 3 General Unsecured Claims in accordance with the provisions of the Plan and (b) $750,000 has been set aside (the "Wind-Down Budget") for the payment of professional fees and statutory fees payable to the Office of the United States Trustee. The Debtors expect that the Wind-Down Budget will be sufficient to pay such fees in full, and thus the entire amount of the Creditor Payment Fund will be available for distribution to holders of Class 3 Allowed General Unsecured Claims. In the event that the

Wind-Down Budget proves insufficient to pay such fees in full, the Liquidating Supervisor will pay such fees from Available Cash and the Creditor Payment Fund.

The Debtors estimate that the aggregate amount of Allowed General Unsecured Claims unpaid on the Effective Date will be approximately $500,000 and project that the recovery of holders of Class 3 Allowed General Unsecured Claims is 20%. The Debtors expect that there will not be sufficient funds to make a meaningful distribution to holders of Class 4 Deficiency Claims. Indeed, the estimated recovery of holders of Class 4 Deficiency Claims is 0% and it is unlikely that such percentage will be increased as the Debtors have no other known assets of any material value. Moreover, the Debtors transferred substantially all of their Causes of Action (including all preference claims arising under Section 547 of the Bankruptcy Code) to the Purchaser pursuant to the Asset Purchase Agreement and the Debtors are unaware of any Causes of Action that they are entitled to bring at this time.

### B. Administrative Consolidation

The Plan contemplates and is predicated upon the administrative consolidation of the Debtors' Estates into a single estate for distribution purposes. Therefore, holders of Claims in each Debtor's case shall receive the identical treatment referenced above and each Unimpaired Class and each Impaired Class shall be deemed automatically to apply in each case as if there were separate plans of liquidation filed in each case. The Plan does not provide for the substantive consolidation of the Debtors following the Effective Date, but all Claims shall be deemed filed against the consolidated Debtors and shall be deemed one Claim against or obligation of the Debtors as if they were consolidated and the holders of such Claims shall receive one distribution from the Debtors' Estates in accordance with the provisions of the Plan.

## C. Summary of the Plan

The following the summarizes classification and treatment of Claims and Interests under the Plan. Holders of Claims and Interests are urged not to rely on this summary and, instead, to read carefully the full text of the Plan. When confirmed, the Plan will be binding upon the Debtors, their Creditors and all holders of Claims and Interests, the Post-Confirmation Estate, the Liquidating Supervisor, and other affected parties. The Debtors believe that Creditors will realize a greater recovery from the Post-Confirmation Estate through the Plan than the recovery that they would receive if distributions were made under Chapter 7 of the Bankruptcy Code.

### (1) Allowed Administrative Expenses.

Since the Petition Date, the Debtors have paid their expenses in the ordinary course of business. In addition, the Purchaser assumed certain post-petition obligations of the Debtors pursuant to the Asset Purchase Agreement and the Sale Order. Accordingly, the Debtors are not aware of any unpaid Administrative Expenses (other than claims for professionals' fees and the Debtors' state and federal tax liabilities).

The Confirmation Order will establish the Final Administrative Expense Bar Date for the filing of all requests for payment of Administrative Expenses (not including Professional Fee Claims), which date shall be thirty (30) days after the Effective Date. Parties asserting a right to payment of an Administrative Expense, other than Professional Fee Claims or United States Trustee fees, not paid prior to the Effective Date must file requests for payment of such Administrative Expenses on or before the Final Administrative Expense Bar Date or shall forever be barred from doing so. The notice of the Confirmation Order to be delivered pursuant to Bankruptcy Rule 3020(c) and 2002(f) will set forth such date and constitute notice of the Final Administrative Expense Bar Date. The Liquidating Supervisor shall have sixty (60) days (or such longer period as may be allowed by order of the Bankruptcy Court) following the Final

37

Administrative Expense Bar Date to review and object to such Administrative Expenses. If no objection is made, then at the end of such sixty (60) day period the Administrative Expense shall be deemed an Allowed Administrative Expense and shall be paid by the Liquidating Supervisor in accordance with the Plan.

Except (i) to the extent that the Liquidating Supervisor and the holder of an Allowed Administrative Expense agree to a different treatment or (ii) the obligations and liabilities with respect to such Administrative Expenses were assumed by the Purchaser, the Liquidating Supervisor shall pay Cash to each holder of Allowed Administrative Expenses from the Post-Confirmation Administrative Reserve (or, to the extent that the Cash in the Post-Confirmation Administrative Reserve is insufficient to pay all Allowed Administrative Expenses in full, from the Creditor Payment Fund) in an amount equal to such Allowed Administrative Expenses on the fifteenth (15th) Business Day of the first month following the month in which such Administrative Expenses becomes Allowed Administrative Expenses in accordance with the Plan, or as soon after such date as is practicable; provided, however, that amounts representing obligations incurred after the Effective Date in the ordinary course of administering the Post-Confirmation Estate shall be paid in full from the Post-Confirmation Administrative Reserve and performed by the Liquidating Supervisor in accordance with the terms and conditions of the particular transactions and any applicable agreements.

Since the Petition Date, the Debtors have paid Professionals' fees in accordance with the *Administrative Order Pursuant to 11 U.S.C. §§ 105(a) and 331, Fed. R. Bankr. P. 2016 and Del. Bankr. L.R. 2016-2 Establishing Procedures for Interim Compensation of Fees and Reimbursement of Expenses for Professionals and Official Committee Members* entered by the Bankruptcy Court on October 12, 2010 [Docket No. 92]. Subsequent to the Effective Date, the

fees of professionals retained on behalf of the Liquidating Supervisor will be paid in accordance with Section 3.2 of the Plan.

(2)     Intercompany Claims.

All Intercompany Claims shall be extinguished as of the Effective Date. No distributions will be made on account of Intercompany Claims.

(3)     Class 1: Allowed Secured Claims.

Class 1 consists of Allowed Secured Claims. The Allowed Claims in Class 1 have been previously satisfied by the Debtors or were assumed by the Purchaser under, and are deemed paid in full pursuant to, the Asset Purchase Agreement and the Sale Order. As a result, the holders of Allowed Claims in Class 1 shall not be entitled to receive any distribution on account of such Claims. Class 1 is Unimpaired by the Plan.

(4)     Class 2: Allowed Priority Claims.

The Claims in Class 2 are of the types identified in Section 507(a) of the Bankruptcy Code that are entitled to priority payment, other than Allowed Administrative Expenses. The Allowed Claims in Class 2 have been assumed by the Purchaser under, and are deemed paid in full pursuant to, the Asset Purchase Agreement and the Sale Order. As a result, the holders of Allowed Claims in Class 2 shall not be entitled to receive any distribution on account of such Claims. Class 2 is Unimpaired by the Plan.

(5)     Class 3: General Unsecured Claims.

Class 3 consists of all Allowed General Unsecured Claims that remain unsatisfied. Except to the extent that the Liquidating Supervisor and the holder of an Allowed General Unsecured Claim against the Debtors agree to a different treatment, the Liquidating Supervisor shall pay to each holder of an Allowed General Unsecured Claim, on the Final Distribution Date, an amount in Cash equal to its *Pro Rata* Share of the Net Creditor Payment Fund. No

Distribution shall be made to holders of Class 3 General Unsecured Claims unless and until all Allowed Administrative Expenses and all Professional Fee Claims have been paid in full, reserved or otherwise resolved, and/or included in or accounted for in the Distribution at issue. The Debtors estimate that the aggregate amount of Allowed General Unsecured Claims unpaid on the Effective Date will total approximately $500,000 and project that the recovery of holders of Class 3 Allowed General Unsecured Claims is 20%. Class 3 is Impaired by the Plan.

(6)     Class 4: Allowed Deficiency Claims of First Lien Secured Parties.

Class 4 consists of the Allowed Deficiency Claims of the First Lien Secured Parties. Except to the extent that the Liquidating Supervisor and the holder of a Class 4 Allowed Deficiency Claim agree to a different treatment, the Liquidating Supervisor shall pay to each holder of a Class 4 Allowed Deficiency Claim, on the Final Distribution Date, its *Pro Rata* Share of Available Cash. No Distribution shall be made to holders of Class 4 Allowed Deficiency Claims unless and until all Allowed Administrative Expenses and all Professional Fee Claims have been paid in full, reserved or otherwise resolved, and/or included in or accounted for in the Distribution at issue. Moreover, notwithstanding anything to the contrary set forth in the Plan, holders of Class 4 Allowed Deficiency Claims shall not be entitled to receive any Distribution from the Creditor Payment Fund.

The Debtors estimate that the aggregate amount of Class 4 Allowed Deficiency Claims unpaid on the Effective Date will total approximately $80.6 million. The Debtors estimate that, after all Allowed Administrative Expenses and all Professional Fee Claims have been paid in full, there will not be any funds on hand to distribute to holders of Class 4 Allowed Deficiency Claims, resulting in a recovery of 0%. **However, there is no way of predicting the final amount of Allowed Administrative Expenses or Professional Fee Claims with certainty.**

**The predicted amount that will be available for distribution to holders of Class 4 Allowed Deficiency Claims is subject to change.** Class 4 is Impaired by the Plan.

(7) Class 5: Allowed Deficiency Claims of Second Lien Claimholders.

Class 5 consists of the Allowed Deficiency Claims of the Second Lien Claimholders. The holders of Allowed Claims in Class 5 shall not be entitled to receive any distribution on account of such Claims. Class 5 is Impaired by the Plan.

(8) Class 6: Interests.

Class 6 consists of the Interests in the Debtors. On the Effective Date, the Interests shall be deemed extinguished, null and void, cancelled and of no force and effect. Accordingly, holders of Interests in Class 6 shall not be entitled to receive any distribution on account of such Interests. Class 6 is Impaired by the Plan.

**D. The Debtors' Remaining Assets**

The Debtors have no other known assets of any material value. Moreover, pursuant to the Asset Purchase Agreement and the Sale Order, the Debtors have transferred to the Purchaser any and all rights, claims, or causes of action, known or unknown, pending or threatened (including all claims arising under Sections 510, 544 through 551 and 553 of the Bankruptcy Code or under similar state laws including fraudulent conveyance claims, preference actions, all claims for professional negligence, malpractice or breach of fiduciary duty and all other claims of the Debtors under the Bankruptcy Code), of the Debtors, including but not limited to, claims or causes of action arising out of or relating in any way to the Chapter 11 Cases, or any of the transactions contemplated thereby or entered into as a consequence thereof. As a result, the Liquidating Supervisor will not have any rights to such claims and the proceeds of such claims will not be available for distribution to the Debtors' Creditors.

**E. Investment of the Assets of the Post-Confirmation Estate**

41

The Liquidating Supervisor may establish one or more interest-bearing accounts as determined may be necessary or appropriate to effectuate the provisions of the Plan consistent with Section 345 of the Bankruptcy Code and any orders of the Bankruptcy Court. The Liquidating Supervisor shall invest any monies held at any time as part of the Post-Confirmation Estate only in the following:

(a) securities issued or fully guaranteed or insured by the United States government or any agency thereof and backed by the full faith and credit of the United States maturing not more than one year from the date of acquisition;

(b) certificates of deposit, time deposits, Eurodollar time deposits, bankers' acceptances or deposit accounts having in each case a remaining term to maturity of not more than one year, which are either (i) fully insured by the Federal Deposit Insurance Corporation or (ii) issued by any lender or by any commercial bank under the laws of any State or any national banking association that has combined capital and surplus of not less than $800,000,000 and whose short-term securities are rated at least A-1 by S&P or P-1 by Moody's;

(c) commercial paper that is rated at least A-1 by S&P or P-1 by Moody's, issued by a company that is incorporated under the laws of the United States or of any State and directly issues its own commercial paper, and has a remaining term to maturity of not more than one year;

(d) repurchase agreements with (i) any commercial bank that is organized or licensed under the laws of any State or any national banking association and that has total assets of at least $1,000,000,000, or (ii) any investment bank that is organized under the laws of any State and that has total assets of at least $1,000,000,000, if such agreement is secured by any one or more of the securities and obligations described in clauses (a), (b) or (c) above having a market value (exclusive of accrued interest and valued at least monthly) at least equal to the principal amount of such investment; or

(e) any money market or other investment fund the investments of which are limited to investments described in clauses (a), (b), (c) and (d) above and which is managed by (i) a commercial bank that is organized under the laws of any State or any national banking association and that has total assets of at least $1,000,000,000, or (ii) an investment bank that is organized under the laws of any State and that has total assets of at least $1,000,000,000.

The Liquidating Supervisor shall be restricted to the collection and holding of such monies and any income earned on such monies and to the payment and distribution thereof for the purposes set forth in the Plan.

42

## F. Method of Distributions Under the Plan

### (1) Required Tax Information

Within 15 days after the Effective Date, the Liquidating Supervisor will send to each Person holding an Allowed Claim or a Disputed Claim a letter (a "W-9 Request Letter") (1) instructing such Person to send the Liquidating Supervisor a completed Internal Revenue Service Form W-9 (or, as applicable, a completed Form W-8); and (2) informing such Person that the Liquidating Supervisor will not make a distribution on account of an Allowed Claim unless and until the holder of an Allowed Claim has returned to the Liquidating Supervisor a fully-completed Form W-9 (or W-8). The Liquidating Supervisor will send W-9 Request Letters to each holder of an Allowed or Disputed Claim at the address of the holder of such Claim set forth on the Debtors' Schedules filed with the Bankruptcy Court, unless superseded by the address as set forth on the proof of claim filed by such creditor or other writing notifying the Liquidating Supervisor of a change of address. Nothing contained in the Plan or this Disclosure Statement will require the Debtors, the Liquidating Supervisor or any other party to attempt to locate any holder of an Allowed Claim or Disputed Claim. If the Liquidating Supervisor does not receive a Form W-9 (or W-8) within ninety (90) days after the date of the W-9 Request Letter, then the Cash reserved on account of such Claim shall become Available Cash and the holder of such Claim shall not be entitled to any distribution from the Post-Confirmation Estate.

### (2) Distributions.

Unless otherwise provided in the Plan, the Liquidating Supervisor shall, on the Final Distribution Date, (i) distribute to each holder of an Allowed General Unsecured Claim in Class 3 its *Pro Rata* Share of the Net Creditor Payment Fund, and (ii) to the extent there is Available Cash subsequent to the Effective Date from any source including, among other things, (A) the liquidation and conversion to Cash of the Assets of the Post-Confirmation Estate, (B) the

investment of Cash, (C) the prosecution and enforcement of Causes of Action (but solely to the extent that such Causes of Action were not transferred to the Purchaser pursuant to the Asset Purchase Agreement), (D) the release of funds from the Disputed Claims Reserve in accordance with Section 9.5 of the Plan, or (E) the return of unclaimed, undeliverable or time-barred distributions to holders of Allowed Claims pursuant to Sections 8.3 or 8.5 of the Plan, distribute to each holder of an Allowed Deficiency Claim in Class 4 its *Pro Rata* Share of such Available Cash. As set forth above, the Debtors estimate that, after all Allowed Administrative Expenses and professional fee claims have been paid in full, there will not be any funds on hand to distribute to holders of Class 4 Allowed Deficiency Claims.

Distributions to holders of Allowed Claims shall be made at the address of each such holder as set forth on the Schedules filed with the Bankruptcy Court unless superseded by the address as set forth on the proofs of claim filed by such holders or other writing notifying the Liquidating Supervisor of a change of address. If any holder's distribution is returned as undeliverable, no further distributions to such holder shall be made unless and until the Liquidating Supervisor is notified of such holder's then current address, at which time all missed distributions shall be made to such holder. All Claims for undeliverable distributions shall be made on or before the thirtieth (30th) day after the date such undeliverable distribution was made. After such date, all unclaimed property shall, at the discretion of the Liquidating Supervisor, be used to satisfy the costs of administering and fully consummating the Plan or shall become Available Cash for distribution in accordance with the Plan, and the holder of any such Claim shall not be entitled to any other or further distribution under the Plan on account of such Claim.

All delivered but uncashed distributions to holders of Allowed Claims shall be handled in accordance with Section 8.5 of the Plan. Checks issued by the Liquidating Supervisor on account of Allowed Claims shall be null and void if not negotiated within sixty (60) days after

the date of issuance thereof. After such date, all funds held on account of such voided check shall, at the discretion of the Liquidating Supervisor, be used to satisfy the costs of administering and fully consummating the Plan or shall become Available Cash for distribution in accordance with the Plan, and the holder of any such Claim shall not be entitled to any other or further distribution under the Plan on account of such Claim or Interest.

Except as provided in the Plan, or as provided in a prior or future order of the Bankruptcy Court, the Liquidating Supervisor shall retain all of the Debtors' rights of setoff and recoupment under Section 553 of the Bankruptcy Code and applicable non-bankruptcy law; provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtors or the Liquidating Supervisor of any such claims, rights and Causes of Action that the Debtors may possess against such holder; and provided, further, that any claims of the Debtors arising before the Petition Date shall first be setoff against Claims against the Debtors arising before the Petition Date.

(3)     Allowed Claims Reserve.

If and to the extent that there remain unpaid Allowed Claims on and after the Effective Date, the Liquidating Supervisor shall hold Cash in the Allowed Claims Reserve in an aggregate amount sufficient to pay each Allowed Claim pursuant to the terms of the Plan. Nothing contained in the Plan shall be deemed to require the Liquidating Supervisor to segregate the Allowed Claims Reserve from the other Assets.

### G.     **Provisions for Treatment of Disputed Claims and Interests**

The Liquidating Supervisor shall have the exclusive right (except as to applications for allowances of compensation and reimbursement of expenses under Sections 330 and 503 of the Bankruptcy Code) to make and file objections to Claims and shall serve a copy of each objection upon the holder of the Claim to which the objection is made as soon as practicable, but in no

event later than one hundred and twenty (120) days after the Effective Date; provided, however, that nothing contained herein or in the Plan shall prevent the Liquidating Supervisor from requesting that the Bankruptcy Court extend such 120-day period, either before or after the passage of such 120-day period.

All objections to Claims shall be litigated to a Final Order except to the extent (1) the Liquidating Supervisor elects to withdraw any such objection or (2) the Liquidating Supervisor and the holder of the Disputed Claim elect to compromise, settle or otherwise resolve any such objection, in which event they may settle, compromise or otherwise resolve any Disputed Claim without approval of the Bankruptcy Court; provided, however, that any compromise of any Disputed Claim with a face value in excess of $50,000 shall be presented to the Bankruptcy Court for approval. If the Liquidating Supervisor and the holder of a Disputed Claim elect to compromise, settle or otherwise resolve the objection to a Disputed Claim with a face amount of $50,000 or less, the Disputed Claim shall be deemed an Allowed Claim in the amount agreed upon by the Liquidating Supervisor and the claimant.

No Cash or other property shall be distributed under the Plan on account of any Disputed Claim, unless and until such Disputed Claim becomes an Allowed Claim. Once any Disputed Claim becomes an Allowed Claim, the Liquidating Supervisor shall, in accordance with the terms of the Plan and on the Final Distribution Date, distribute from the Disputed Claims Reserve to the holder of such Allowed Claim the amount of Cash that such holder is entitled to receive under the Plan on account of such Claim.

All of the above-described objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another.

## H. Executory Contracts and Unexpired Leases

46

On the Effective Date, all executory contracts and unexpired leases that exist between the Debtors and any Person shall be deemed rejected as of the Effective Date, except for any executory contract or unexpired lease (i) which has been assumed by the Debtors and assigned to the Purchaser in accordance with the Sale Order, (ii) which was assumed or rejected pursuant to an order of the Bankruptcy Court entered prior to the Effective Date, (iii) as to which a motion for approval of the assumption or rejection of such contract or lease has been filed and served prior to the Effective Date, or (iv) which appear on Schedule A attached to the Plan. Entry of the Confirmation Order shall constitute the approval, pursuant to Section 365(a) of the Bankruptcy Code, of the rejection of the executory contracts and unexpired leases rejected pursuant to the Plan.

Claims, if any, arising out of the rejection of an executory contract or unexpired lease pursuant to the Plan must be filed with the Bankruptcy Court no later than forty (40) days after the Confirmation Date. Any Claims not filed within such applicable time periods will be forever barred from assertion against the Debtors, the Estates and the Post-Confirmation Estate. Any and all Claims arising from the termination or rejection of an executory contract or unexpired lease that took place prior to the Effective Date that were not filed by the General Bar Date or any applicable subsequent deadline established by an order of the Bankruptcy Court will be deemed disallowed in full.

## I. Effect of Confirmation

The Bankruptcy Court shall not enter a Confirmation Order unless and until the Confirmation Order is reasonably acceptable in form and substance to the Debtors. Until the Effective Date, the Bankruptcy Court shall retain jurisdiction of the Debtors, the Estates and their Assets. Thereafter, the jurisdiction of the Bankruptcy Court shall be limited to the subject matters set forth in Section 13 of the Plan.

Except as otherwise provided in Section 1141(d)(3) of the Bankruptcy Code, on and after the Confirmation Date, the provisions of the Plan shall bind any holder of a Claim against, or Interests in, the Debtors and their respective successors and assigns, whether or not the Claim or Interest of such holder is Impaired under the Plan and whether or not such holder has accepted the Plan.

From and after the Effective Date, and as provided for by the Confirmation Order, there shall be in place with regards to the Post-Confirmation Estate a permanent injunction to the same extent and with the same effect as the stay imposed by Section 362 of the Bankruptcy Code. Such permanent injunction will remain in effect until the Chapter 11 Cases are closed pursuant to Section 350 of the Bankruptcy Code, except as otherwise expressly provided in the Plan or as may be agreed to in writing by the Liquidating Supervisor.

### J.    Effective Date of the Plan

The Effective Date shall occur on a date, determined by the Debtors in their sole discretion, that is as soon as reasonably practicable after the date on which the following conditions are satisfied or waived: (a) the Bankruptcy Court shall have entered an order confirming the Plan in form and substance satisfactory to the Debtors; (b) no stay of the Confirmation Order shall then be in effect; (c) the Debtors determine that it is in the best interests of the Estates that the Plan become effective; and (d) the Debtors shall have filed a notice of the Effective Date in the Debtors' Bankruptcy Cases. Notwithstanding the foregoing, the Effective Date shall occur no later than thirty (30) days after entry by the Bankruptcy Court of an unstayed order confirming the Plan; provided, however, that nothing contained in the Plan shall be deemed to prevent the Debtors from requesting that the Bankruptcy Court extend such 30-day period for cause shown.

### K.    Implementation of the Plan

On the Effective Date, the remaining Assets of the Debtors shall vest in the Post-Confirmation Estate for the purpose of fully administering the Plan. The Debtors, through the Liquidating Supervisor, shall liquidate such Assets and distribute the proceeds from such liquidation to the holders of Allowed Claims in accordance with the provisions of the Plan. Except as otherwise provided in the Plan, or as provided in a prior or future order of the Bankruptcy Court, no Asset of the Estates shall be deemed abandoned and no Cause of Action shall be deemed released or compromised by or as a result of the Plan, its Confirmation, its consummation or its treatment of any Claim, Interest or Creditor. Further, no defense, set-off, counterclaim or right of recoupment shall be deemed waived or compromised.

In furtherance of the implementation of the Plan, except as otherwise provided in the Plan, all injunctions or stays provided for in the Chapter 11 Cases pursuant to Sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Effective Date, shall remain in full force and effect and apply to all Persons holding Claims against or Interests in the Debtors, the Estates, the Post-Confirmation Estate, and the Liquidating Supervisor, until entry of the Final Decree.

From and after the Effective Date, the Debtors shall continue to exist until such time as the Liquidating Supervisor determines to dissolve the Debtors. After the Final Distribution Date, pursuant to Section 1123(b) of the Bankruptcy Code, the Liquidating Supervisor shall be authorized to file each Debtor's final tax returns and oversee the resolution of such tax returns, including any requests pursuant to Section 505(b) of the Bankruptcy Code that the IRS and state authorities determine the unpaid tax liability, if any, of the Debtors. Further, the Liquidating Supervisor shall be authorized to file and shall file with the official public office for keeping corporate or limited liability company records, as applicable, in each Debtor's state of incorporation or formation a certificate of dissolution or equivalent document. Such a certificate

of dissolution may be executed by the Liquidating Supervisor without need for any action or approval by the shareholders, members or board of directors of any Debtor or any other Person. From and after the Final Distribution Date, the Debtors (i) for all purposes shall be deemed to have withdrawn their business operations from any state in which they were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum or take any other action, in order to effectuate such withdrawal and (ii) shall not be liable in any manner to any taxing authority for franchise, business, license or similar taxes accruing on or after the Final Distribution Date.

Notwithstanding anything to the contrary in the Bankruptcy Rules providing for earlier closure of the Chapter 11 Cases, when all Disputed Claims filed against the Debtors have become Allowed Claims or have been disallowed by Final Order, all remaining Assets have been liquidated and converted into Cash (other than those assets, if any, abandoned by the Debtors or the Liquidating Supervisor), and all Available Cash has been distributed to Creditors in accordance with the Plan, or at such earlier time as the Liquidating Supervisor deems appropriate, the Liquidating Supervisor shall seek authority from the Bankruptcy Court to close the Chapter 11 Cases in accordance with the Bankruptcy Code and the Bankruptcy Rules.

## L.    Duties and Responsibilities of Liquidating Supervisor

On the Effective Date, the Liquidating Supervisor shall assume all of the responsibilities, duties and obligations of the Debtors' board of directors, members and officers that arise after the Effective Date under the Plan and shall be empowered and authorized to satisfy such responsibilities, duties and obligations without further corporate or limited liability company authorization, as applicable, as may have been required prior the Effective Date. These duties, responsibilities and obligations of the Liquidating Supervisor include, but are not limited to, the following, all of which are done on behalf of the respective Debtors:

50

(1)     paying Allowed Claims in accordance with the terms of the Plan;

(2)     the preparation and filing, in the name and on behalf of the Debtors, of all original and amended tax returns of the Debtors for all periods, whether before or after the Effective Date, and controlling all audits and examinations with respect thereto, including exercising, as determined by the Liquidating Supervisor in his sole discretion, the right to request a determination of tax liability as set forth in Section 505 of the Bankruptcy Code and litigating any and all disputes with taxing authorities;

(3)     administration of employee benefits, including, but not limited to matters regarding any Debtors' 401(k) plan, if any, and/or COBRA issues;

(4)     preservation or liquidation of Assets or the distribution of proceeds of Assets;

(5)     payment of post-Confirmation fees due to the Office of the United States Trustee;

(6)     filing of status reports with the Bankruptcy Court or other parties in interest;

(7)     approving or disapproving any corporate or limited liability company action, including any action that would otherwise require shareholder or member action under applicable state law;

(8)     responding to inquiries of Creditors;

(9)     commencing and/or prosecuting any and all objections to Claims or Interests;

(10)    any duty of care, loyalty or other duty imposed or imputed by law;

(11)    purchasing appropriate errors and omissions or director and officer insurance to insure the Liquidating Supervisor;

(12)    commencing and/or prosecuting any Causes of Action (but solely to the extent that such Causes of Action were not transferred to the Purchaser pursuant to the Asset Purchase Agreement);

(13)    filing a motion for a Final Decree;

(14)    filing post-Confirmation quarterly operating results; and

(15)    any responsibility, duty and obligation of the Debtors under the Plan.

On and after the Effective Date, the Liquidating Supervisor shall hold in reserve Cash, available whether through the Wind-Down Budget or the Creditor Payment Fund, as applicable

(the "Post-Confirmation Administrative Reserve"), in an amount to be determined by the Liquidating Supervisor to fund the administration of the Post-Confirmation Estate in accordance with the terms of the Plan, including, without limitation, the compensation of the Liquidating Supervisor, compensation of the professionals retained by the Liquidating Supervisor, and the payment of all other reasonable and reasonably anticipated expenses, debts, charges, liabilities and obligations relating to the Post-Confirmation Estate and its administration, including, without limitation, any tax owed by the Debtors or the Post-Confirmation Estate. Any balance remaining in the Post-Confirmation Administrative Reserve after the payment (as determined by the Liquidating Supervisor) of all expenses, debts, charges, liabilities and obligations intended to be paid therefrom shall become Available Cash. Any monies deposited in the Post-Confirmation Administrative Reserve shall be invested in interest-bearing deposits or investments specified in Section 7.13 of the Plan, and the interest earned thereon shall be credited thereto.

## M. Summary of Other Provisions of the Plan

The following paragraphs summarize certain other significant provisions of the Plan. The Plan should be referred to for the complete text of these and other provisions of the Plan:

(1) Classes.

Any class or subclass of Claims that does not contain as an element thereof an Allowed Claim or a Claim temporarily allowed under Bankruptcy Rule 3018 as of the date of the commencement of the Confirmation Hearing shall be deemed deleted from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such class or subclass under Section 1129(a)(8) of the Bankruptcy Code.

(2) Retention of Professionals.

The Liquidating Supervisor may retain such attorneys (including special counsel), accountants, advisors, expert witnesses, and other professionals as he shall consider advisable

52

without necessity of approval of the Bankruptcy Court. The reasonable fees and expenses of the Liquidating Supervisor and the professionals retained by the Liquidating Supervisor shall be paid by the Liquidating Supervisor from the Post-Confirmation Estate in accordance with Section 14.10 of the Plan.

        (3)    **Injunction**.

**Upon the Effective Date and in consideration of the distributions to be made under the Plan, except as otherwise provided in the Plan or a further order of the Bankruptcy Court, all persons or entities who have held, hold or may hold Claims or Interests and all other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, representatives and affiliates, are permanently enjoined, from and after the Effective Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim or Interest against the Debtors, their Estates, the Post-Confirmation Estate, or the Liquidating Supervisor, or any of their respective properties or assets, other than to enforce any right to a distribution pursuant to the Plan, (ii) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the Debtors, their Estates, the Post-Confirmation Estate, or the Liquidating Supervisor, or any of their respective properties or assets, (iii) creating, perfecting or enforcing any Lien or encumbrance of any kind against the Debtors, their Estates, or the Post-Confirmation Estate or against the property or interests in property of the Debtors, their Estates or the Post-Confirmation Estate or (iv) without further order of the Bankruptcy Court, asserting any right of set-off, subrogation or recoupment of any kind against any obligation due from the Debtors, their Estates or the Post-Confirmation Estate or against the property or interests in property of the Debtors, their Estates or the Post-Confirmation Estate, with**

respect to any such Claim or Interest. Such injunction shall extend to any successors or assignees of the Debtors, their Estates, the Post-Confirmation Estate, the Liquidating Supervisor and their respective properties and interest in properties.

(4)     **Exculpation**.

Neither the Debtors, the Liquidating Supervisor, nor any of their respective current and former members, shareholders, affiliates, officers, directors, employees, attorneys, actuaries, accountants, financial advisors, investment bankers, professionals, advisors or agents shall have or incur any liability to any holder of a Claim or Interest or any other Person for any act or omission in connection with, or arising out of, the Chapter 11 Cases, the pursuit of confirmation of the Plan, the preparation and distribution of this Disclosure Statement, the Asset Purchase Agreement, the solicitation of votes with respect to the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan except for any such liability based on the willful misconduct or gross negligence of such parties, as determined by a Final Order of the Bankruptcy Court, or based on the failure of the Liquidating Supervisor to make a Distribution to Creditors in accordance with the Plan, and, in all respects, the Debtors, the Liquidating Supervisor, and each of their respective current and former members, shareholders, affiliates, officers, directors, employees, attorneys, actuaries, accountants, financial advisors, investment bankers, professionals, advisors and agents shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

(5)     **Release**.

Pursuant to the Plan, as of the Effective Date, (a) the Debtors, their Estates, the Post-Confirmation Estate, the Liquidating Supervisor and their respective successors and assigns and any Person claiming a right in a derivative capacity on their behalf, and (b)

each holder of a Claim that actually votes to accept or reject the Plan and, in connection therewith, does not mark its Ballot so as to indicate its refusal to grant the releases described in the Plan, shall unconditionally and irrevocably release all of the Released Parties (defined below) from any and all direct, indirect or derivative claims, obligations, suits, judgments, Liens, damages, rights, liabilities, rights of contribution and indemnification, and all other Causes of Action not otherwise transferred to the Purchaser pursuant to the Asset Purchase Agreement (other than the right of the Debtors and the Liquidating Supervisor, as applicable, to enforce the Plan and any and all contracts, instruments, releases, indentures and other agreements or documents delivered thereunder), whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, based on or relating to or in any manner arising from, in whole or in part, the Debtors, their Estates, their property, assets, operations or liabilities, the Chapter 11 Cases, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor, any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan and this Disclosure Statement, or related agreements, instruments or other documents, which claims, obligations, suits, judgments, Liens, damages, rights, liabilities, rights of contribution and indemnification, and other Causes of Action are based in whole or in part on any act, omission, transaction, event or other occurrence (except for willful misconduct or gross negligence) taking place before the Effective Date. For the purposes of the Plan, "Released Parties" means the Debtors, their Estates, the Post-Confirmation Estate, and the Liquidating Supervisor, together with each of their respective members,

**officers, directors, employees, advisors, actuaries, attorneys, financial advisors, investment bankers, professionals and agents.**

    (6)    <u>Retiree Benefits</u>.

        (a)    <u>Section 1129(1)(13) Benefits</u>.

The Debtors and their professionals continue to investigate whether the Debtors, other than as required by Section 4980B of the Internal Revenue Code of 1986, as amended, have funded or maintained any retiree benefit plans, funds or programs as defined in Section 1114 of the Bankruptcy Code, for the purpose of providing or reimbursing payments for retired employees and their spouses and dependents for medical, surgical, or hospital care benefits, or benefits in the event of sickness, accident, disability, or death under any plan, fund, or program (through the purchase of insurance or otherwise) ("<u>Section 1114 Retiree Benefits</u>"). As of the date hereof, the Debtors do not believe that they funded or maintained such Section 1114 Retiree Benefits. If the Debtors did in fact fund or maintain such Section 1114 Retiree Benefits, such benefits were provided to a relatively small number of employees and the aggregate amount of benefits that may be due to such retired employees likely is minimal.

In the event that the Debtors (or, if after the Effective Date, the Liquidating Supervisor) determine that the Debtors (a) funded or maintained any Section 1114 Retiree Benefits; or (b) otherwise have contractual obligations to provide retirement or related benefits to retired employees who did not receive notice of the applicable bar dates in this case, then the Debtors (or, if after the Effective Date, the Liquidating Supervisor) will terminate such retirement benefits, notify all retired employees eligible for such retirement benefits of the same and will establish a deadline for such retired employees to submit proofs of claim.

(b)　401(k) Plans.

On January 1, 2001, the Debtors created the Cedar Point Communications 401(k) Plan (the "401(k) Plan"). Pursuant to the 401(k) Plan, the Debtors withheld 401(k) contributions from the wages of participating employees, who were permitted to contribute up to one hundred percent of their annual compensation (not to exceed the federal statutory limitation) to their 401(k) accounts. At the Debtors' discretion, the Debtors matched, on a dollar-for-dollar basis, contributions made by employees to their 401(k) accounts, up to a limit that was uniformly determined by the Debtors for all employees. The Debtors terminated the 401(k) Plan immediately prior to the consummation of the Sale, and all of the Debtors' financial obligations with respect to the 401(k) Plan have been satisfied.

(7)　Amendment, Modification, Withdrawal or Revocation of the Plan.

The Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan at any time prior to the entry of the Confirmation Order. After the entry of the Confirmation Order, but before the Effective Date, the Debtors may, upon approval of the Bankruptcy Court, amend or modify the Plan, in accordance with Section 1127(b) of the Bankruptcy Code. At any time after the Confirmation Date, the Debtors or the Liquidating Supervisor, as applicable, may, without approval of the Bankruptcy Court and provided that it does not materially or adversely affect the interests of creditors, remedy any defect or omission or reconcile any inconsistency in the Plan or in the Confirmation Order in such manner as may be necessary to carry out the purpose and intent of the Plan.

The Debtors may withdraw or revoke the Plan at any time prior to the Confirmation Date. If the Debtors revoke or withdraw the Plan prior to the Confirmation Date, then the Plan shall be deemed null and void. In such event, nothing contained in the Plan shall be deemed to constitute a waiver or release of any Claim by or against the Debtors or any other person or to prejudice in

any manner the rights of the Debtors or any other person in any further proceedings involving the Debtors.

      (8)    Effectuating Documents and Further Transactions.

After the Effective Date, the Liquidating Supervisor shall be authorized to execute, deliver, file, or record such contracts, instruments, releases and other agreements or documents and take such actions on behalf of the Debtors as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

      (9)    Exemption from Transfer Taxes.

Pursuant to Section 1146(c) of the Bankruptcy Code, the assignment or surrender of any lease or sublease, or the delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including any deeds, bills of sale or assignments executed in connection with any disposition of Assets contemplated by the Plan shall not be subject to any stamp, real estate transfer, mortgage recording or other similar tax.

      (10)    Fees and Expenses of Professionals.

Each Professional retained by the Debtors with approval by order of the Bankruptcy Court or requesting compensation in the Chapter 11 Cases pursuant to Sections 330 or 503(b) of the Bankruptcy Code shall be required to file an application for an allowance of final compensation and reimbursement of expenses in the Chapter 11 Cases incurred through the Effective Date on or before a date to be set by the Bankruptcy Court in the Confirmation Order. Objections to any such application shall be filed on or before a date to be set by the Bankruptcy Court in the Confirmation Order.

After the Effective Date, the costs associated with winding up the affairs of the Estates including statutory fees, if any, payable to the United States Trustees' Office, shall be paid in the

ordinary course as they become due and without the necessity for any approval by the Bankruptcy Court.

(11)   Payment of Statutory Fees and Costs of Administering the Estate.

All fees payable pursuant to Section 1930 of Title 28 of the United States Code, as determined by the Bankruptcy Court at the hearing pursuant to Section 1128 of the Bankruptcy Code, will be paid on or before the Effective Date. All post-confirmation fees, if any, required under 28 U.S.C. §1930(a)(6) shall be paid by the Debtors in accordance with Section 14.10 of the Plan.

## ARTICLE V
## ACCEPTANCE AND CONFIRMATION OF THE PLAN

The Bankruptcy Code provides that any class of creditors or stockholders whose rights are "impaired" under a proposed plan has the right to vote, as a class, to accept or reject the plan. A class of claims accepts a plan if the holders of more than two-thirds in amount of the allowed claims actually voting in such class and more than one-half in number of the allowed claims actually voting in such class vote to accept the proposed plan.

Classes 1 and 2 are unimpaired under the Plan and, therefore, are conclusively presumed to accept the Plan. Classes 1 and 2 are not entitled to vote on the Plan. Classes 3 and 4 are impaired under the Plan and are entitled to vote on the Plan. Classes 5 and 6 are impaired under the Plan and, because such Classes will not receive any distribution under the Plan, are conclusively deemed to have rejected the Plan. Classes 5 and 6 are not entitled to vote on the Plan.

Thus, in order for the Plan to be accepted and thereafter confirmed by the Bankruptcy Court, the Plan must meet the "cram down" requirements set forth in Section 1129(b) of the Bankruptcy Code. Section 1129(b) of the Bankruptcy Code permits the confirmation of a plan

notwithstanding the non-acceptance of a plan by one or more impaired classes of claims or interests. Under that section, a plan may be confirmed if (a) at least one class of impaired claims accepts the plan and (b) the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each non-accepting class.

## A. Voting Procedures

### (1) Submission of Ballots

Each holder of a Class 3 Allowed General Unsecured Claim and each holder of a Class 4 Allowed Deficiency Claim[3] has received, with this Disclosure Statement, a form of ballot to be used in voting whether to accept or reject the Plan. A pre-addressed envelope for returning the ballot to the Voting Agent is enclosed for your convenience. Holders of Claims in Classes 1, 2 and 5, holders of Interests in Class 6, and Claims that are not required to be classified are NOT entitled to vote on the Plan under the Bankruptcy Code. Votes by holders of such Claims and Interests are not being solicited and if submitted, will not be taken into account.

Each holder of a Class 3 Allowed General Unsecured Claim and each holder of a Class 4 Allowed Deficiency Claim should first review this Disclosure Statement and the Plan and then complete the ballot. All votes to accept or reject the Plan must be cast by using the ballot provided, or a copy of such ballot. The ballot must be signed by such holder, or an officer, partner or authorized agent of such holder. If a ballot is signed by trustees, executors, administrators, guardians, attorneys-in-fact, officers of corporations or others acting in a fiduciary or representative capacity, such persons should indicate such capacity when signing and submit proper evidence satisfactory to the Debtors of their authority to so act when the ballot is returned to the Voting Agent. Only original signed ballots will be deemed effective.

---

[3] For purposes of voting on the Plan, holders of Class 3 Allowed General Unsecured Claims and Class 4 Allowed Deficiency Claims will be determined as of the Record Date.

Completed and signed ballots must be returned to the Voting Agent using the enclosed envelope, or if you do not use the enclosed envelope, to the following address:

| First Class Mail | Overnight, Courier, Hand Delivery |
|---|---|
| Thompson Publishing Ballot Processing<br>c/o Epiq Bankruptcy Solutions, LLC<br>FDR Station, P.O. Box 5014<br>New York, NY 10150-5014 | Thompson Publishing Ballot Processing<br>c/o Epiq Bankruptcy Solutions, LLC<br>757 Third Avenue, Third Floor<br>New York, NY 10017 |

**Ballots should be returned as soon as possible, and in any event must be returned so that they are actually received by 4:00 p.m. (prevailing Eastern time) on May 4, 2011.** Ballots received thereafter, or ballots not conforming to the requirements set forth therein or above, may not be accepted and counted.

Except as provided below, unless the ballot being furnished is timely submitted on or prior to the voting deadline together with any other documents required by such ballot, the Debtors may, in their discretion, reject such ballot as invalid and therefore decline to count it in connection with seeking confirmation of the Plan by the Bankruptcy Court.

A vote by a holder of a Class 3 Allowed General Unsecured Claim or Class 4 Allowed Deficiency Claim may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such holder's acceptance or rejection of the Plan was not in good faith or was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

(2)     Incomplete and Improperly Completely Ballots

Any ballot received by the Debtors which does not indicate either an acceptance or rejection of the Plan shall be deemed to constitute an invalid ballot. Any ballot received by the Debtors which indicates both an acceptance and rejection of the Plan will be deemed a vote to accept the Plan.

(3)     Waiver of Defects, Irregularities, etc.

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptances and revocations or withdrawal of ballots will be determined by the Debtors, whose determination will be final and binding. The Debtors reserve the absolute right to: (i) contest the validity of any revocation or withdrawal of any vote on the Plan, (ii) reject any and all ballots not in proper form, and (iii) waive any defects or irregularities or conditions of delivery as to any particular ballot. The interpretation of the applicable requirements (including those with respect to the ballot and the instructions thereto) by the Debtors, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties. Unless waived, any defects or irregularities in connection with the deliveries of ballots must be cured within such time as the Debtors (or the Bankruptcy Court) determine. Neither the Debtors nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of ballots nor will any of them incur any liabilities for failure to provide such notification. Unless otherwise directed by the Bankruptcy Court, delivery of such ballots will not be deemed to have been made until such irregularities have been cured or waived. Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalid.

**B.** **Confirmation of the Plan**

The Bankruptcy Court must hold a confirmation hearing before deciding whether to confirm the Plan. The Plan will not be valid until the Bankruptcy Court has entered a Final Order confirming the Plan. The Plan will become effective on the Effective Date.

(1) Confirmation Hearing

A hearing on confirmation of the Plan, and on any objections to the Plan, will be held on [_____ ], 2011 at [ _:_ ] (prevailing Eastern time) (the "Confirmation Hearing"), before the Honorable Peter J. Walsh, United States Bankruptcy Judge, United States Bankruptcy

Court, 824 North Market Street, Wilmington, Delaware 19801. Any creditor, stockholder or other party in interest wishing to object to confirmation of the Plan must file a written objection with the Bankruptcy Court, and serve a copy of the objection, so that it is received before May 4, 2011 at 4:00 (prevailing Eastern time) (the "Plan Objection Deadline"), on: (a) co-counsel to the Debtors, John F. Ventola, Esq. and Sean M. Monahan, Esq., Choate, Hall & Stewart LLP, Two International Place, Boston, Massachusetts 02110; (b) co-counsel to the Debtors, Derek C. Abbott, Esq., Chad A. Fights, Esq. and Alissa T. Gazze, Esq., Morris, Nichols, Arsht & Tunnell LLP, 1201 North Market Street, P.O. Box 1347, Wilmington, Delaware 19899-1347; and (c) the Office of the United States Trustee, J. Caleb Boggs Federal Building, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attention: Juliet Sarkessian. In order to preserve an objection, anyone filing an objection to confirmation must also attend the Confirmation Hearing, either in person or through counsel, except that a corporation may appear only through counsel. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement made at the Confirmation Hearing or any adjournment of that hearing. **UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT WILL NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

(2)     Requirements for Confirmation of the Plan

At the confirmation hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements for confirmation listed in Section 1129 of the Bankruptcy Code. If the Bankruptcy Court determines that all confirmation requirements are satisfied, it will enter an order confirming the Plan.

## ARTICLE VI
## ALTERNATIVES TO LIQUIDATING PLAN

Upon the completion of the Sale, the Debtors ceased substantially all business operations and, as of the date hereof, the Debtors have liquidated substantially all of their assets. There is no alternative to the Plan that would envision a continuation of the Debtors as ongoing businesses. Since there is no alternative to liquidation, the Plan embodies what the Debtors consider to be the best method of completing the orderly liquidation and distribution of the Debtors' assets to Creditors. The Debtors believe that the decision to stay in Chapter 11, even after it became apparent that there would be no ongoing businesses to reorganize, has facilitated the cost-effective disposition of the Debtors' assets during the bankruptcy cases and the distribution of the proceeds thereof to Creditors.

If the Plan is not confirmed, then the Chapter 11 Cases may be converted to cases under Chapter 7 of the Bankruptcy Code. In that event, the Debtors would cease their liquidation and distribution efforts and a Chapter 7 trustee would be appointed to liquidate and distribute the remaining assets of the Estates. Such a Chapter 7 trustee would be entitled to receive a statutorily allowed commission and to retain professionals such as legal counsel and financial advisors, thereby increasing the operating costs associated with the liquidation of the Debtors' Estates. Thus, a Chapter 7 case is not an attractive or superior alternative to the Plan.

Indeed, the primary advantage of distributing assets under the Plan as opposed to a Chapter 7 liquidation process is that, as set forth in the liquidation analysis attached hereto as Exhibit B (the "Liquidation Analysis"), holders of Allowed Claims are likely to receive distributions more promptly and in a higher amount than what would be available in Chapter 7. Moreover, the Debtors believe that confirming the Plan and keeping the instant cases in Chapter 11 permits the Debtors, and following the Effective Date, the Liquidating Supervisor, to use the

personnel and Professionals who are already familiar with the Debtors' businesses and the events that took place during the instant cases, thereby facilitating an efficient wind-up of the Post-Confirmation Estate. Thus, the Debtors believe that the Plan represents the best available alternative for maximizing recoveries for holders of Allowed Claims.

[ *REMAINDER OF PAGE LEFT BLANK INTENTIONALLY.* ]

## ARTICLE VII
## CONCLUSION AND RECOMMENDATION

The Debtors believe that confirmation and implementation of the Plan will provide each creditor with a greater recovery than it would receive if the Debtors were to be liquidated and their assets distributed under Chapter 7, in which case there would likely be a delay in making distributions to creditors and creditors would likely receive smaller distributions. The Debtors believe that confirmation and implementation of the Plan is the best possible outcome for Creditors and is in their best interests. **Thus, the Debtors recommend that each holder of a Class 3 Allowed General Unsecured Claim and each holder of a Class 4 Allowed Deficiency Claim vote in favor of the Plan.**

Dated: March 28, 2011

Respectfully submitted,

TPH SELLER, INC.

By: _____
Name: James J. Loughlin, Jr.
Title: Vice President and
Chief Restructuring Officer

AHC SELLER LLC

By: _____
Name: James J. Loughlin, Jr.
Title: Vice President and
Chief Restructuring Officer

AES SELLER, INC.

By: _____
Name: James J. Loughlin, Jr.
Title: Vice President and
Chief Restructuring Officer

TPG SELLER, INC.

By: _____
Name: James J. Loughlin, Jr.
Title: Vice President and
Chief Restructuring Officer

PI SELLER, INC.

By: _____
Name: James J. Loughlin, Jr.
Title: Vice President and
      Chief Restructuring Officer

TAH SELLER, INC.

By: _____
Name: James J. Loughlin, Jr.
Title: Vice President and
      Chief Restructuring Officer

TPD SELLER, INC.

By: _____
Name: James J. Loughlin, Jr.
Title: Vice President and
      Chief Restructuring Officer

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Derek C. Abbott (Bar No. 3376)
Chad A. Fights (Bar No. 5006)
Alissa T. Gazze (Bar No. 5338)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
Telephone: (302) 658-9200
Facsimile: (302) 658-3989

-and-

CHOATE, HALL & STEWART LLP
John F. Ventola
Sean M. Monahan
Two International Place
Boston, MA 02110
Telephone: (617) 248-5000
Facsimile: (617) 248-4000

*Counsel to Debtors and Debtors in Possession*